UNION OIL COMPANY OF CALIFOR-
NIA, Plaintiff-Appellee,

v.

UNITED STATES DEPARTMENT OF
ENERGY, and James B. Edwards, Jr.,
Secretary of Energy, Defendants-Appel-
lants.

TOSCO CORPORATION,
Plaintiff-Appellant,

v.

UNITED STATES DEPARTMENT OF
ENERGY, and James B. Edwards, Jr.,
Secretary of Energy, Defendants-Appel-
lees.

TOSCO CORPORATION,
Plaintiff-Appellee,

v.

UNITED STATES DEPARTMENT OF
ENERGY, and James B. Edwards, Jr.,
Secretary of Energy, Defendants-Appel-
lants.

TOSCO CORPORATION,
Plaintiff-Movant,

v.

UNITED STATES DEPARTMENT OF
ENERGY, and James B. Edwards, Jr.,
Secretary of Energy, Defendants-Re-
spondents.

Nos. 9–60 to 9–64.

Temporary Emergency Court of Appeals.

Argued June 10, 1982.

Decided Sept. 1, 1982.

Rehearing and Rehearing En Banc
Denied Oct. 5, 1982.

and Kathrine L. Henry, Dept. of Energy, Washington, D. C., were on the brief, for United States Dept. of Energy, and James B. Edwards, Jr., Secretary of Energy.

Paul J. Mode, Jr., with whom William J. Perlstein and Bruce E. Coolidge, Wilmer, Cutler & Pickering, Washington, D. C., and George C. Bond, Vice President and Gen. Counsel of Union Oil Co., Los Angeles, Cal. (of counsel), were on the brief for Union Oil Co.

Kenneth L. Bachman, Jr., with whom Eugene M. Goott and John G. Finneran, Jr., Cleary, Gottlieb, Steen & Hamilton, Washington, D. C., and C. Rex Boyd, Jeanette M. Thomas, Robert W. Cardwell, Jr., Tosco Corp., Los Angeles, Cal., were on the brief for Tosco Corp.

David L. Roll, Daryl A. Chamblee, Kathleen M. Flanagan, Steptoe & Johnson, Washington, D. C., and Arthur J. Wright (of counsel), Dallas, Tex., counsel for Atlantic Richfield Co.; Charles E. Cheek, Bradley F. Stuebing, and Robert F. Ochs (of counsel), Houston, Tex., counsel for Gulf Oil Corp.; and Robert B. Gex, Pillsbury, Madison & Sutro, San Francisco, Cal., counsel for Chevron U.S.A. Inc., were on the brief for amici curiae Atlantic Richfield Co., Gulf Oil Corp., and Chevron U.S.A. Inc.

Karen S. Bedell, Jamie Replogle, Shank, Irwin, Conant & Williams, Dallas, Tex., were on the brief for amicus curiae Hunt Oil Co.

Richard B. Herzog, J. Stephen Lawrence, Jr., Pepper, Hamilton & Scheetz, Washington, D. C., Paul W. Wommack, Sam S. Norvell, Mitchell Energy & Development Corp., The Woodlands, Tex.; Bill J. Zimmerman, Jay G. Martin, Superior Oil Co., Houston, Tex.; Henry W. Hooker, Ravenna Oil Co., Nashville, Tenn.; were on the brief for amici curiae Mitchell Energy & Development Corp., The Woodlands, Tex., Superior Oil Co., and Ravenna Oil Co.

B. Bruce McClean, Daniel Joseph, Harry R. Silver, Charles P. Warren, Akin, Gump, Strauss, Hauer & Feld, Washington, D. C., and Charles S. Lindberg, William F. Streets, and Gail F. Schultz, Mobil Oil

Thomas C. Newkirk, with whom Larry P. Ellsworth, Peter Aron, Robert C. Power,

Corp., Fairfax, Va. (of counsel), counsel for Fletcher Oil & Refining Co., Mobil Oil Corp., and Murphy Oil Corp.; W. Bayless Rowe, of El Dorado, Ark., counsel for Murphy Oil Corp.; David A. Nelson, Squire, Sanders & Dempsey, and D. Frank Frisina, of Cleveland, Ohio, counsel for The Standard Oil Co. (Ohio); Keith A. Jones, Warren Belmar, Fulbright & Jaworski, Washington, D. C., counsel for Diamond Shamrock Corp. Kerr-McGee Corp., Texaco, Inc. and Exxon Corp.; John V. Cottle and Jerry D. King, Amarillo, Tex., counsel for Diamond Shamrock Corp., Patrick J. Clarke, Oklahoma City, Okl., counsel for Kerr-McGee Corp., Stephen H. Bard and Elizabeth P. Smith, White Plains, N. Y., counsel for Texaco, Inc., and W. J. McAnelly, Jr. and Edward de la Garza, Houston, Tex., counsel for Exxon Corp., were on the brief for amici curiae Diamond Shamrock Corp., Exxon Corp., Fletcher Oil and Refining Co., Kerr-McGee Corp., Mobil Oil Corp., Murphy Oil Corp., The Standard Oil Co. (Ohio) and Texaco, Inc.

Fred W. Drogula, Patricia N. Blair, Ginsburg, Feldman, Weil & Bress, Washington, D. C., were on the brief for amici curiae Clark Oil and Refining Corp. and Commonwealth Oil Refining Co., Inc.

William H. Bode, John E. Varnum, Batzell, Nunn & Bode, Washington, D. C., were on the brief for amici curiae Hudson Oil Co., Texas American Petrochemicals, Inc., U.S. & Refining Co., Gladieux Refinery, Inc., Peerless Oil & Chemicals, Inc., and Vicksbury Refining Co.

Edwin Jason Dryer, Michael R. Bromwich, Foley, Lardner, Hollabaugh & Jacobs, Washington, D. C., were on the brief for amicus curiae Independent Refiners Ass'n of America.

Joseph A. Katarinic, Thomas A. Donovan, Wendy D. Smith, David J. Sponseller, Kirkpatrick, Lockhart, Johnson & Hutchison, Pittsburgh, Pa., and Robert H. Compton and Kathleen C. Gillmore (of counsel), Ashland Oil Co., Inc., Russell, Ky., were on the brief for amicus curiae, Ashland Oil, Inc.

Allen Tupper Brown, James A. Wilderotter, Thomas E. Fennell, Lisa M. Bell, Jones, Day, Reavis & Pogue, Washington, D. C., and Kent B. Hampton, J. Furman Lewis, and John A. Evans (of counsel), Findley, Ohio, were on the brief for amicus curiae Marathon Oil Co.

Stephen A. Herman, Stephen E. Story, Kirkland & Ellis, Washington, D. C., M. J. Keating, Matthew J. Gallo, Chicago, Ill., were on the brief for amicus curiae Amoco Production Co.

Before CHRISTENSEN, JAMESON and ZIRPOLI, Judges.

JAMESON, Judge.

On January 28, 1981, President Reagan issued Executive Order 12287, which immediately exempted all crude oil and refined petroleum products from price and allocation controls. On February 19, 1981, the DOE issued Ruling 1981–1, which allows producers to continue to recoup certain expenses incurred in connection with the development of enhanced oil recovery (tertiary) projects, as long as the expenses were incurred, paid and reported prior to February 28 and March 31, 1981 respectively, through the recertification of crude oil sold in December, 1980 and January, 1981. The validity of Ruling 1981–1 is the primary issue on these appeals. In *Union Oil Company of California v. DOE, et al.,* the ruling was held invalid by the District Court for the Central District of California, 530 F.Supp. 717. (Appeal No. 9–60). Its validity was upheld in *Tosco Corporation v. DOE, et al.,* by the District Court for the District of Nevada, 532 F.Supp. 686. (Appeal No. 9–61).

No. 9–63 involves the validity of a so-called "in house" expense amendment allowing producers to recoup expenses paid to affiliated entities for development of tertiary projects. In No. 9–64 Tosco has moved for injunctive relief requesting this court to order the DOE to determine the amount of excess payments each crude oil producer received and pro-rate distribution to the refiner-participants in the Entitlements Program.

## I. Regulatory History

### A. Crude Oil Price Controls

Regulations administered by the DOE and its predecessor agencies governed the allocation and price of crude oil from August 19, 1973 until January 28, 1981. See 10 C.F.R. Parts 210–212. For purposes of the price controls, crude oil was divided into three categories. "Old" domestic crude oil was generally that portion of production which did not exceed the base production control level and was subject to a "lower-tier" maximum price. "New" or "upper-tier" domestic crude oil, where production was in excess of the base period level, could be sold at significantly higher but controlled prices. The third category, "exempt oil," including foreign oil, and domestic oil, newly discovered or produced from a stripper well or pursuant to tertiary recovery techniques, could be sold at uncontrolled or market prices.[1] See 10 C.F.R. Part 212, subpart D.

The regulations required each producer to certify the category of crude oil sold to a purchaser. 10 C.F.R. § 212.131. This was necessary to ensure that a purchaser not pay a price in excess of the maximum allowable for the category of crude oil purchased. The regulations did not initially specify when the certifications had to be made. As a result of complaints of long delays in making the required certifications, the DOE amended its regulations in 1975 to impose a two month limit on the issuance of certifications by producers.[2] The two-month limitation period provided greater predictability and stability to refiners' crude oil costs while still allowing producers adequate time to determine the correct clas-

sification for which a given volume of crude oil had qualified. 40 Fed.Reg. 13522, 13523 (March 27, 1975).

### B. The Tertiary Incentive Program

Tertiary enhanced recovery techniques are higher cost production methods which maximize oil production from a depleting field.[3] In 1976 Congress directed the DOE to amend its price regulations to provide "additional price incentives for bona fide tertiary enhanced recovery techniques." Energy Conservation and Production Act (ECPA) § 122, 15 U.S.C. § 757(j)(1)(A). Pursuant to that directive, on July 26, 1978, the DOE adopted an amendment to its price regulations, 10 C.F.R. § 212.78 (1979), which provided that increased production of crude oil resulting from a qualified and certified enhanced recovery project would be exempt from price controls. 43 Fed.Reg. 33678 (Aug. 1, 1978). This regulation created a new category of exempt crude oil known as "tertiary incremental crude oil." Effective September 1, 1978, crude oil produced by using tertiary techniques could be sold at market prices.

Concluding that further production incentives were needed, the DOE amended 10 C.F.R. § 212.78 to add the so-called Tertiary Incentive Program (not to be confused with the Tertiary Incremental Program previously adopted). This program was intended "to provide front-end money to producers engaged in the initiation or expansion of tertiary enhanced crude oil projects . . ." up to a limit of 20 million dollars per project. 44 Fed.Reg. 18677 (March 29, 1979).

Effective January 1, 1980, the Tertiary Incentive Program permitted a producer to

---

**1.** By December, 1980, the average prices of lower-tier and upper-tier crude oil were respectively $7.49 and $15.51 per barrel, while the average price of exempt crude oil was $34.55 per barrel, 46 Fed.Reg. 14157, 14158 (Feb. 26, 1981).

**2.** 10 C.F.R. § 212.131(a)(6) stated in pertinent part:

Certifications required by this paragraph (a) to be made with respect to each sale [of *inter alia*, tertiary incentive crude oil] shall be made within the consecutive two-month period immediately following the month in which

that sale is made. After the close of [that period] no certification, other than a certification of lower-tier ("old") crude oil, shall be effective with respect to the purchaser of that crude oil, except where such certification explicitly is required or permitted by DOE order, interpretation or ruling.

**3.** Tertiary techniques typically include the injection of carbon dioxide, steam, or other substances in order to increase pressures in the oil reservoir and thereby promote additional production. See 10 C.F.R. § 212.78(c).

recoup up to 75% of the "allowed expenses" it had "incurred" and "paid" in connection with a "qualified tertiary enhanced recovery project." 10 C.F.R. § 212.78(c). Producers were permitted to self-certify their projects as "qualified" and their expenses as "incurred" and "paid," subject to possible DOE audit. 10 C.F.R. § 212.78(d). Allowed expenses which had been incurred, paid, and reported could be recouped by selling otherwise price-controlled crude oil at uncontrolled market prices. 44 Fed.Reg. 51148, 51149 (Aug. 30, 1979). No limitations were imposed on prepaying tertiary expenses, so a producer could currently recoup prepaid expenses even though the tertiary enhanced recovery project might not be begun for a period of months or even years. 45 Fed.Reg. 40106, 40107. (Aug. 15, 1980).

In order to allow tertiary producers that sold little or no price-controlled crude oil to benefit from the program, the DOE permitted a producer with an interest in a qualified tertiary project to purchase a temporary interest in another producer's price-controlled oil, Interpretation 1980–22, 45 Fed.Reg. 61563, 61564 (Sept. 16, 1980), or to sell other producers a temporary interest in its tertiary project. Interpretation 1981–3, 46 Fed.Reg. 27281 (May 18, 1981). To add even more flexibility, the DOE allowed

> [p]articipating producers with respect to a particular project [to] attribute the recoupable allowed expenses among themselves in whatever proportion they determine, regardless of their actual interest in the project. This flexibility will permit participants in a project to agree upon internal business arrangements with minimal governmental interference.

44 Fed.Reg. 51148, 51149 (Aug. 30, 1979).

In other words, except for the two-month recertification limitation in § 212.131(a)(6) [4]

and the requirement that the producer have an interest in the particular tertiary project, there were no limitations as to when or where the crude oil had been produced. The producers could certify or recertify previously price-controlled crude oil as tertiary incentive crude oil and then bill purchasers at the market price for that oil, as long as the additional revenue then received did not exceed the allowed tertiary expenses incurred, paid, and reported by the producer.

### C.  The "In-House" Expenses Amendment

When the Tertiary Incentive Program was first implemented the definition of "recoupable allowed expenses", 10 C.F.R. § 212.78(c), did not permit recovery of in-house expenses, i.e., those incurred between affiliated entities. On August 8, 1980, the DOE proposed to amend the definition to include in-house expenses, as long as they did not exceed the price that would have been paid in an arms-length transaction. 45 Fed.Reg. 54–688 (August 15, 1980). Following a lengthy period for comment,[5] the DOE on December 29, 1980, adopted the "in-house" amendment, effective January 5, 1981, 46 Fed.Reg. 1246 (January 5, 1981). Section 4(c) of the Administrative Procedure Act, 5 U.S.C. § 553(d) requires that publication of a rule be made at least 30 days before its effective date. The DOE addressed this requirement in the preamble to the final rule, concluding that it satisfied two of the three statutory exceptions to § 4(c), namely that it "relieved a restriction" and there was "good cause" for immediate adoption.

### D.  The Entitlements Program

Although the validity of the Entitlements Program, 10 C.F.R. § 211.67, is not directly challenged in this litigation, the program

---

**4.** Because 10 C.F.R. § 212.131(a)(6) required that certifications be made "within the consecutive two-month period immediately following the month in which [the] sale [was] made," the typical industry practice was to sell crude oil at an indeterminate price, with the understanding that the market price would be charged (e.g., through retroactive invoicing) if the producer

was able to recertify the oil as tertiary incentive crude oil within the two months following the month of sale.

**5.** The DOE received 27 comments. 25 favored the amendment. None opposed it. Tosco was not one of the commentators.

does affect the ultimate impact of the Tertiary Program on refiners and the consuming public. The DOE promulgated the Entitlements Program in 1974 to permit all refiners to share proportionately in the financial benefits resulting from the availability of a limited quantity of relatively inexpensive, price-controlled crude oil. 39 Fed.Reg. 42246 (Dec. 4, 1974).

Under the Entitlements Program, a refiner was required to have one "entitlement" for each barrel of "deemed old oil" that it refined.[6] Refiners with greater access to price-controlled crude oil made cash payments to refiners with less access to such oil. These payments were made pursuant to a monthly "Entitlements Notice" which specified the amount of money to be paid or received by each refiner. The price of an entitlement was roughly the difference between the price of controlled and uncontrolled crude oil. These transactions allocated lower-priced crude oil among domestic refiners without requiring the actual physical transfer of this oil.[7]

Certifications of price-controlled crude oil as exempt crude oil under the Tertiary Incentive Program reduced the total amount of crude oil production subject to price controls each month and therefore increased the total cost of the available crude oil supply. As a result, the benefits of price-controlled crude oil which were distributed among all refiners by the Entitlements Program were reduced. Thus, to the extent that crude oil producers sold otherwise price-controlled crude oil as uncontrolled crude oil under the Tertiary Incentive Program, the higher cost of such uncontrolled crude oil was distributed among all domestic refiners through the operation of the Entitlements Program.

### E. Decontrol of Crude Oil

President Reagan's Executive Order 12287, issued on January 28, 1981, provided in pertinent part:

By the authority vested in me as President by the Constitution and statutes of the United States of America, including the Emergency Petroleum Allocation Act of 1973, as amended [15 U.S.C. § 751 et seq.], ... and in order to provide for an immediate and orderly decontrol of crude oil and refined petroleum products, it is hereby ordered as follows:

Section 1. All crude oil and refined petroleum products are exempted from the price and allocation controls adopted pursuant to the Emergency Petroleum Allocation Act of 1973, as amended. The Secretary of Energy shall promptly take such action as is necessary to revoke the price and allocation regulations made unnecessary by this Order.

. . . . .

Sec. 3. The Secretary of Energy may, pursuant to Executive Order No. 11790 as amended by Executive Order No. 12038, adopt such regulations and take such actions as he deems necessary to implement this Order, including the promulgation of entitlements notices for periods prior to this Order and the establishment of a mechanism for entitlements adjustments for periods prior to this Order.

Sec. 4. The Secretary of Energy is authorized to take such other actions as he deems necessary to ensure that the purposes of this Order are effectuated.

. . . . .

46 Fed.Reg. 9909–10 (January 30, 1981). The Executive Order was made effective immediately because "advance notice of and public procedure on the decontrol provided by this Order would be likely to cause actions that could lead to economic distortions and dislocations...." Id. at 9910.

On January 29, 1981, President Reagan issued a memorandum to his cabinet offi-

---

6. "Deemed old oil" was defined at 10 C.F.R. § 211.67(b)(2). Generally, one barrel of lower-tier crude oil equalled one barrel of deemed old oil. One barrel of upper-tier crude oil equalled a specified fraction of a barrel of deemed old oil, which was computed monthly.

7. For a more detailed description of the Entitlements Program see Cities Service Co. v. FEA, 529 F.2d 1016, 1021 (Em.App.1975), cert. denied, 426 U.S. 947, 96 S.Ct. 3166, 49 L.Ed.2d 1184 (1976) and Pasco Inc. v. FEA, 525 F.2d 1391, 1395–96 (Em.App.1975).

cers, including the Secretary of Energy, directing them to postpone for 60 days the effective date of all regulations that had not been promulgated in final form and which were scheduled to become effective during the 60-day period. 46 Fed.Reg. 11227 (Feb. 6, 1981) (RA 1519). The postponement was ordered to permit "full and appropriate review [of] many of the prior Administration's last-minute decisions," *id.*, and would have applied to the in-house expenses amendment if it had not been made effective immediately. This 60-day postponement period expired on March 30, 1981, one day before the DOE deleted the provisions of the Tertiary Incentive Program from the Code of Federal Regulations. 46 Fed.Reg. 20508, 20509 (April 3, 1981).

#### F.  *Ruling 1981–1*

On February 12, 1981, the DOE issued Ruling 1981–1 in which it stated that crude oil sold during December 1980 and January 1981 could be certified or recertified during the two-month period following the month in which the crude oil was sold, if such oil "would have otherwise qualified for lawful recertification (or certification) prior to the implementation of the Executive Order." 46 Fed.Reg. 12945, 12947 (question and answer no. 5) (Feb. 19, 1981).

With respect to the Tertiary Incentive Program, the Ruling, in Answer 7, reads:

Absent the Executive Order, a qualified producer that would have incurred, paid, and reported its allowed expenses prior to February 28 and March 31, 1981 respectively, could have recovered those expenses through the recertification of crude oil sold in the months of December 1980 and January 1981, respectively, as long as those recertifications were made within the consecutive two-month period within which such certification is permitted under 10 C.F.R. 212.131(a)(6). Executive Order 12287 is intended to provide for an immediate decontrol of crude oil and refined petroleum products. The Order does not abrogate the right that accrued to a firm to establish prices for

crude oil prior to January 28, 1981. Thus, a firm may become a qualified producer as defined in 10 C.F.R. 212.78(c) on or after January 28, 1981. A qualified producer may also recover allowed expenses through the recertification of crude oil sold in the months of December 1980 and January 1981, respectively, as long as the producer has incurred, paid, and reported those expenses prior to February 28 and March 31, 1981, respectively.

46 Fed.Reg. at 12947.

The DOE thus interpreted the Executive Order as permitting crude oil sold in December and January to be certified or recertified after the date of decontrol, not only to reflect expenses incurred and paid prior to decontrol, but also with respect to expenses incurred and paid after January 28, 1981. Producers could continue to certify new tertiary projects and recover expenses incurred and paid in connection with those projects until March 31, 1981.

On March 31, 1981, the DOE issued a Final Rule abolishing most regulations. 46 Fed.Reg. 20508 (April 3, 1981). That rule noted that most provisions, including the tertiary incentive program, would become unnecessary after April 1, 1981, and accordingly with the exception of reporting requirements, the regulations were revoked as of that date.

#### G.  *Proposed Rulemaking re: Tertiary Incentive Program*

The DOE's conclusion that expenses incurred and paid after January 27, 1981, could be recouped through predecontrol sales of crude oil led to a large increase in (re)certifications under the Tertiary Incentive Program. This was recognized in an Advance Notice of Proposed Rulemaking issued by the DOE on March 17, 1981:

[I]n the past couple of months, especially since the President's decontrol Executive Order, the amount of recoupable allowed expenses reported to [DOE] has increased phenomenally. At the same time, refiners have informed DOE that the volume of crude oil being recertified as tertiary

incentive oil has increased beyond their greatest expectations.

46 Fed.Reg. 17566 (Mar. 19, 1981).[8]

The notice set forth the DOE's tentative conclusion that recoupment of expenses should be limited to those incurred and paid on or before March 19, 1981. 46 Fed.Reg. 17566 (March 19, 1981).

On April 28, 1981, the DOE issued a Notice of Proposed Rulemaking—proposing to rescind various aspects of the Tertiary Incentive Program, including (1) any allowed expenses incurred or paid after March 19, 1981; (2) in-house expenses; and (3) prepaid expenses incurred and paid after January 27, 1981. The DOE explained that the proposed rulemaking "would eliminate the abuses that may have occurred under the program without undermining the purposes of the program." 46 Fed.Reg. 25315 (May 6, 1981).

On July 8, 1981, following a public hearing and review of written comments, the DOE issued a Notice reporting that it had found

no evidence to support its tentative conclusions concerning in-house allowed expenses, prepaid allowed expenses incurred or paid after January 27, 1981, or all allowed expenses incurred or paid after March 19, 1981. Rather, numerous firms in their oral and written comments demonstrated that because of the provisions permitting the recovery of these allowed expenses they have initiated EOR (enhanced oil recovery) activity that otherwise would not have been undertaken. These firms further demonstrated that the provisions proposed to be rescinded had been instrumental in the early initiation of many EOR projects. This encouragement to EOR activity should result in increased domestic crude oil production that otherwise would not have occurred. These are the precise goals ERA sought in adopting the incentive program. Also, these firms conclusively demonstrated that the retroactive nature of the two

additional proposed changes would seriously impact outstanding projects, cause havoc in the industry, and divest them of funds received and spent in detrimental reliance on the then existing regulatory provisions.

46 Fed.Reg. 36103 (July 13, 1981). Accordingly, the DOE decided not to adopt any of the proposals in its April 28 notice. *Id.* The agency stated that it intended to publish "a more extensive analysis of the record and comments in the future," *id.*, but such an analysis has yet to be published.

## II. *Prior Proceedings*

### A. *Diamond Shamrock Corp. v. Edwards*

Prior to the DOE's July, 1981 decision, four refiners sought a preliminary injunction in the United States District Court for the District of Delaware ordering the DOE to cease enforcement of the Entitlements Program and the Tertiary Incentive Program. After expedited briefing and argument, the court denied preliminary injunctive relief, holding that the plaintiffs had failed to show irreparable injury or that they were likely to prevail on the merits. *Diamond Shamrock Corp. v. Edwards*, 510 F.Supp. 1376, 1386 (D.Del.1981). In its opinion the court focused primarily on plaintiffs' allegations with respect to the Entitlements Program.

The court found "the plaintiffs' position regarding the tertiary incentive program to be somewhat stronger, but not sufficiently compelling to meet their burden of success on the merits." 510 F.Supp. at 1390. The court concluded that (1) the Executive Order simply exempted petroleum products from any further price and allocation controls and had no effect upon sales completed before January 28, 1981; (2) the Order did not expressly revoke any regulations, but instead directed the DOE to "take such action as is necessary to revoke the price and allocation regulations made necessary by this Order"; (3) by encouraging investment in tertiary recovery projects, the Rul-

---

**8.** Tertiary recertifications during the three-month period from January 1, 1981 through March 31, 1981, resulted in crude oil increases totalling approximately one billion dollars—almost as large as the total for the preceding 13 months.

ing advances the President's avowed purpose to boost domestic production of crude oil; and (4) the Ruling protects the reliance interest of those producers who prior to decontrol had "probably made commitments based upon the expectation that they would receive front end money through the tertiary incentives program." *Id.* at 1390–91. The court also observed that the alleged abuse of the Ruling "has been recognized by DOE and is being remedied by rulemaking which would rescind the tertiary incentive program with respect to any allowed expenses that are incurred and paid after March 19, 1981." *Id.* at 1390.[9]

### B. *Union Oil Company of California v. DOE*

On April 22, 1981, Union filed its complaint in the District Court for the Central District of California, challenging the validity of Ruling 1981–1. Following oral argument on cross-motions for summary judgment, the court granted Union's motion, holding that Answer 7 of the Ruling was invalid because "January 28, 1981 was the effective date of the cut-off of all these regulations." In its opinion, filed on December 9, 1981, the court found that "DOE's position contravene[d] the language and the intent of the President's Executive Order, the regulations, and the Congress." The court reasoned that the Ruling's extension of the Tertiary Incentive Program beyond the date of decontrol could not be reconciled with (1) the President's failure to include the Tertiary Incentive Program in the Order's listing of regulatory programs to be extended for a limited period after January 28, or (2) the President's announced intention to rely solely upon market forces to boost domestic production of oil.

The court held that the provision in 10 C.F.R. § 212.131(a)(6) allowing (re)certifications to be made within two months following the month in which the crude oil is purchased is a procedural rule that merely extends the time for reporting tertiary expenses already incurred and paid. Accordingly the DOE acted unlawfully in purporting to permit crude oil based on expenses incurred or paid after January 27, 1981.

### C. *Tosco Corporation v. DOE*

Following a hearing on December 14, 1981, the District Court for the District of Nevada, in a memorandum decision and order filed on February 10, 1982, upheld the validity of Ruling 1981–1 and invalidated the "in house" amendment.

#### 1. *Ruling 1981–1*

The district court held that Ruling 1981–1 was an interpretative rule and applied well established standards of deference in determining that the Ruling properly interpreted the regulations and the Executive Order. Contrary to the holding in *Union Oil*, the court concluded that the Executive Order did not terminate the Tertiary Incentive Program on January 28, 1981. Rather the court agreed with the holding in *Diamond Shamrock* (510 F.Supp. at 1390):

> Moreover, [the Executive Order] did not revoke any validly promulgated regulations but instead, directed DOE to "take such action as is necessary to revoke the price and allocation regulations made unnecessary by this Order." Thus, the regulations allowing retroactive price increases in order to recoup certain expenses are still in force and because the President's Order did not apply to the oil sales before January 28, 1981, those still valid regulations would work to allow retroactive price increases.

Accordingly the court held that the ruling permitting continued application of the tertiary incentive regulations to crude oil sales occurring prior to decontrol was neither erroneous nor arbitrary and capricious.

#### 2. *In House Amendment*

The district court found that "DOE has failed to sustain its burden of showing that

---

**9.** The court's opinion in *Diamond Shamrock* was filed on April 7, 1981, prior to the DOE's notices of April 28, 1981 and July 13, 1981.

its making the 'in house' expense amendment effective immediately upon publication of the final rule was justified under an exception to the 30-day wait required by 5 U.S.C. § 533(d)." Accordingly the court held "that said action was unlawful as being done without observance of procedure required by law. 5 U.S.C. § 706(2)(D); see also § 211(d)(1) of 12 U.S.C. § 1904 note."

### III. Contentions on Appeal

In Appeals No. 9–60 and No. 9–61, Union Oil and Tosco contend that Ruling 1981–1 is invalid. Their reasons may be summarized as follows: (1) Executive Order 12287 terminated the Tertiary Incentive Program; (2) extension of the Program beyond the date of decontrol violated the intent of Congress and exceeded the Agency's statutory authority; (3) the Program permitted recovery of expenses only through the sale of current production; and (4) the DOE's extension of the Program was arbitrary, capricious, and unlawful.

In Appeal No. 9–63, the DOE contends that the court erred in holding the "in-house" amendment invalid; that the amendment "relieved a restriction" and "good cause existed for making the amendment effective upon publication"; and that even assuming noncompliance with the Administrative Procedure Act, the proper remedy would be to postpone the effective date for 30 days.

In No. 9–64, Tosco seeks injunctive relief under Section 211 of the Economic Stabilization Act and requests this court to provide comprehensive relief for all parties injured by agency action found unlawful, by determining the amount of excess payments each crude oil producer received and prorate distribution to refiner-participants in the Entitlements Program.

*Amicus Curiae* Marathon Oil Company [10] contends that all of the appeals should be dismissed as moot because of the expiration of the Emergency Petroleum Allocation Act on September 30, 1981.

### IV. Suggestion of Mootness

■ Marathon contends that these actions are now moot because the DOE's power to grant the types of relief requested expired on September 30, 1981, pursuant to 15 U.S.C. § 760g.[11] Marathon argues that the "savings clause" in § 760g (see note 11) preserves only the DOE's power to bring "enforcement" proceedings. Because the issuance of Entitlement Notices would not constitute enforcement proceedings, it argues that the DOE is now precluded from issuing the "clean-up" notices or the notice for January, 1981. Marathon contends further that even though any relief for Union or Tosco might not involve the issuance of Entitlement Notices, it would "involve the issuance of other orders by DOE and, very likely amendment of its EPAA regulations—perhaps even regulations DOE has previously revoked pursuant to the Decontrol Order."

In a memorandum opposing Marathon's motion to file a brief as *amicus curiae*, Union agrees with Marathon that the DOE now lacks the power to issue the remaining Entitlement Notices, but contends that the DOE's continuing enforcement authority gives it the power to collect excess charges from crude oil producers and to refund them to the customers who were overcharged. In support of this contention Union cites this court's recent opinion in *Citronelle-Mobile Gathering, Inc. v. Edwards*, 669 F.2d 717, 723 (Em.App.1982) where the court, in a case decided after the EPAA expired, held that "the Government has a *duty* to try to ascertain those overcharged,

---

**10.** *Amici curiae* briefs have been filed by 27 companies in support of or in opposition to positions taken by the various parties.

**11.** 15 U.S.C. § 760g provides in pertinent part: "The authority to promulgate and amend any regulation or to issue any order under this chapter shall expire at midnight September 30,

1981, but such expiration shall not affect any action or pending proceedings, administrative, civil, or criminal, not finally determined on such date, nor any administrative, civil, or criminal action or proceeding, whether or not pending, based upon any act committed or liability incurred prior to such expiration date."

and refund them, with interest, from the restitution funds." [12]

We agree with Union that the DOE's enforcement authority carries with it the power to collect tertiary overcharges and disburse refunds, whether or not it may issue further Entitlement Notices.[13] It is clear also that the appeals involve a live and continuing dispute between Union and Tosco, on the one hand, and the DOE on the other. The appeals involve a "substantial controversy, between parties having adverse legal interests of sufficient immediacy and reality" to warrant a prompt resolution of the controversy. See *Super Tire Engineering Co. v. McCorkle*, 416 U.S. 115, 122, 94 S.Ct. 1694, 1698, 40 L.Ed.2d 1 (1974).[14] We reject Marathon's suggestion of mootness.

### V. Validity of Ruling 1981–1

#### A. Deference to the DOE's Interpretation

■ These cases involve the deference due the DOE's interpretation of a statute, executive order, and regulations. As the Supreme Court stated in *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965), the courts show "great deference to the interpretation given [a] statute by the officers or agency charged with its administration;" and "when the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order." Similar deference is shown an agency interpretation of an executive order. *University of Southern Cal. v. Cost of Living Council*, 472 F.2d 1065, 1068

(Em.App.1972), *cert. denied*, 410 U.S. 928, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973).

■ As this court held in *Energy Consumers and Producers Ass'n v. DOE*, 632 F.2d 129 (Em.App.), *cert. denied*, 449 U.S. 832, 101 S.Ct. 102, 66 L.Ed.2d 38 (1980), an agency's ruling will be upheld if it "was a reasonable choice of possible interpretations by the responsible agency. It is not required that the interpretation be the only reasonable choice.... In the absence of exceptional adverse circumstances this court should defer to a reasonable exercise expertise expressed in an interpretation rule by an administrative agency." *Id.* at 143. See also *Pennzoil Company v. DOE*, 680 F.2d 156 (Em.App.1982).[15]

#### B. Did Executive Order Terminate the Tertiary Program?

■ The district court in Union concluded that "The plain language of the President's Executive Order indicates that all oil price controls, minus those expressly excepted,[16] were to be terminated on January 28, 1981." In urging affirmance of this holding, Union and Tosco, as well as *amici* supporting their position, argue that the regulations constituting the Tertiary Program were unquestionably an element of the crude oil price controls whose operation was terminated on January 27, so that "upon issuance of the Executive Order, DOE no longer had authority to extend any aspect of the crude oil program, including the Tertiary Program." Appellant Tosco Brief, No. 9–61, pages 14–15.

---

12. Union notes also that Marathon did not seek to raise the issue of mootness by intervening or appearing *amicus curiae* in either of the district courts.

13. It is unnecessary to determine whether the "savings clause" in § 760g preserves the DOE's power to issue the remaining Entitlement Notices. Moreover, that issue has been squarely presented in a number of pending cases, including *Marathon Oil Co. v. DOE*, C.A. No. C 81–634 (N.D.Ohio); *Diamond Shamrock Corp. v. Edwards*, C.A. No. 81–101 (D.Del.); *Mobil Oil Corp. v. DOE*, 81–CV–340 (N.D.N.Y.).

14. While *McCorkle* was an action for declaratory judgment, we find the same principle applicable here.

15. These general principles will be considered in more detail in their application to the DOE's interpretation of the statute, executive order and pertinent regulations.

16. The Executive Order specifically preserved all reporting and recordkeeping requirements (Section 2(a)), three programs governing the allocation of middle distillates and Canadian crude oil (Sections 2(b), 2(c), and 2(e)), allocation orders previously issued under the "Buy-Sell" program (Section 2(d)), and the Entitlements Program (Section 3). 46 Fed.Reg. 9909 (Jan. 30, 1981) (R. 1214).

The DOE and supporting *amici* contend that the Executive Order did not *revoke* any regulations, but rather *prospectively exempted* crude oil from "price and allocation controls" and directed the Secretary to "take such action as is necessary to revoke the price and allocation regulations made unnecessary by this order."[17] The DOE argues that "The only effect of the Executive Order on [the] regulatory scheme was that, with the lifting of price controls as of January 28, and consequently, the elimination of price-controlled oil thereafter, January 27, 1981 became the last day on which a producer could have produced and sold price controlled crude oil."[18] Because the Order was effective "immediately," not retroactively, it did not affect the regulations governing prices charged in crude oil sales prior to decontrol. This would include §§ 212.78 and 212.131(a)(6), *supra*, permitting a producer at any time during the two-month period following a particular month in which it produced and sold crude oil to recover a portion of allowed tertiary expenses. The DOE reasons that with the elimination of price controls as of January 28, January 27 became the last day on which a producer could have produced and sold price controlled crude oil. March 31, 1981—the close of the two-month certification period—became the last day on which a producer could certify price-controlled crude oil as tertiary incentive crude oil. At that point all of the crude oil price regulations became "unnecessary" under the Executive Order, and their substantive provisions were revoked as of that date. 46 Fed.Reg. 20508 (April 3, 1981).

With respect to the enumerated exceptions (see note 16 *supra*), the DOE argues that these programs imposed price and allocation controls on crude oil and petroleum products *after* the date of decontrol. Ac-

cordingly it was necessary specifically to remove those programs from the effect of the order. By contrast, the tertiary incentive regulations were concerned with crude oil sold *prior* to January 28, after which there was no price-controlled crude.

When the Executive Order was issued the tertiary incentive regulations applied to controlled oil sold in December, 1980 and January, 1981. The Secretary considered these regulations, as they applied to this controlled oil, to be necessary. Producers and refiners had planned substantial tertiary projects prior to January 28, 1981, on the basis of projected recoveries of allowed expenses under the Tertiary Incentive Program. We find merit in the contention of the DOE and supporting *amici* that the retroactive termination of the tertiary incentive regulations would have the adverse effect of reducing incentives to domestic production and interrupting extensive tertiary planning in direct contravention of the policies underlying the Executive Order, which was not intended to affect the application of the pricing regulations on sales occurring prior to the date of the Order. We agree with the court in *Diamond Shamrock* that the interpretation of the DOE is in accord with the language of the Executive Order, and that

> The allowance of retroactive price increases will still serve the original purpose of the tertiary incentives program and will even advance the purposes of the President's decontrol Order. It will encourage production by encouraging investment in tertiary recovery projects.

510 F.Supp. at 1390.

We conclude that the DOE's interpretation of the Executive Order is a reasonable one: that the Order did not terminate the

---

17. As noted above, this was the conclusion of the court in *Diamond Shamrock v. Edwards*, *supra*, and the district court in Tosco (No. 9–61). The court in *Diamond Shamrock* found that "The Executive Order simply exempted petroleum products from any further price and allocation controls and had no effect upon sales completed before January 28, 1981."

18. Similarly, *Amici* Atlantic Richfield Company, Gulf Oil Corporation and Chevron U. S. A. Inc., argue that "By the plain meaning of the Executive Order, only crude oil sold *after* January 27, 1981 was expressly 'exempted' from the 'price and allocation controls'." *Amici* Brief, pg. 5. "The Order plainly had no effect on crude oil sold *before* January 28, 1981." *Amici* Brief, pg. 3.

tertiary incentive regulations and affected only crude oil sold *after* January 27, 1981. Crude oil sold after that date was expressly *"exempted"* from the "price and allocation controls." The order expressly delegated to the Secretary the responsibility of taking action to *revoke* unnecessary regulations and to adopt regulations and take action "necessary to implement this Order." We agree with the DOE that sales before January 28, 1981 were still subject to the regulations, "even if aspects of the transaction took place at a later time." [19]

C. *Was Ruling 1981–1 Within the Statutory Authority of the EPAA?*

■ Union, Tosco, and supporting *amici* contend that the DOE's extension of the Tertiary Incentive Program beyond the date of decontrol was in violation of the intent of Congress as expressed in EPAA section 8(j)(1)(A), 15 U.S.C. § 757(j)(1)(A) (added by ECPA § 122(9)). Pub.L.No.94–385, 90 Stat. 1125, 1134 (1976). The district court in *Union* found that "Both the floor debates and the Conference Report on the legislation make clear that Congress' purpose was limited to *correcting the disincentive* to tertiary production that had inadvertently been created by the then existing price controls." It is contended that in continuing the Tertiary Incentive Program to provide incentives during the period *after* decontrol has been accomplished, the DOE exceeded the scope of its legislative mandate.[20]

The DOE argues that in light of the fact that the Ruling merely interpreted the Executive Order, plaintiffs' argument "is actually that the President lacked the statutory authority to decontrol in the manner chosen in the executive order, as interpreted by Ruling 1981–1." The DOE argues further that the President did not exceed the scope of his mandate because the legislative history shows that Congress' dominant purpose was to increase domestic crude oil production by encouraging investment in costly, high-risk tertiary techniques and that it directed the President to provide incentives *by means of*, rather than merely *because of*, the pricing regulations.

*Amici* Atlantic Richfield Company, *et al.* (ARCO) argue that it is unnecessary to consider the legislative history [21] since the statutory language is "clear and unambiguous on its face." [22] Section 8(j)(1)(A) authorizes amendments to price control regulations for the express purpose of "provid[ing] additional price incentives for bona fide tertiary enhanced recovery techniques...." 15 U.S.C. § 757(j)(1)(A). ARCO argues that by stating that the Executive Order was intended to permit recoupment of allowed tertiary expenses paid during the normal two-month recertification period with respect to crude oil sold before decontrol, the Ruling clearly provid-

---

**19.** The DOE notes also that "The President chose not to revoke the regulation but rather to follow the previously established method of implementing decontrol by product exemption from regulations which continued in effect." Appended to the *amicus* brief of Mitchell Energy & Development Corp., Superior Oil Company and Ravenna Oil Company are exhibits indicating that the DOE and the Office of the President had cooperated in the drafting of the Executive Order and that the DOE gave the Office of Management and Budget advance notice of the proposal to issue Ruling 1981–1.

**20.** The district court in Union did not expressly determine that Ruling 1981–1 was in excess of statutory authority, but rather found it "inconsistent with Congressional intent." Conclusions of Law 14 and 19. On the other hand, the court in *Diamond Shamrock* concluded: "The allowance of retroactive price increases will still serve the original purpose of the tertiary incentives program and will even advance the purposes of the President's decontrol Order. It will encourage production by encouraging investment in tertiary recovery projects." 510 F.Supp. at 1390.

**21.** The district court in Union and both sides on appeal quote extensively from selective portions of the legislative history. Plausible arguments are made for the different interpretations for which the respective parties contend.

**22.** "[W]here the language of the enactment is clear and construction according to its terms does not lead to absurd or impracticable consequences, the words employed are to be taken as the final expression of the meaning intended." *Church of Scientology v. Department of Justice*, 612 F.2d 417, 421 (9 Cir. 1979).

ed an incentive for the earlier initiation of enhanced recovery projects. The Ruling was thus consistent with the plain meaning of the tertiary incentive provisions of the EPAA.

The DOE also notes that when it came to the Agency's attention after decontrol that the regulations might no longer be serving their intended purpose, the agency instituted a rulemaking proceeding proposing to revoke the regulations. As noted above, the DOE determined at the conclusion of the proceedings that the provisions of the regulations had in fact encouraged tertiary activity which should result in increased domestic crude oil production that otherwise would not have occurred, so that the precise goals of the program continued to be achieved. 46 Fed.Reg. 36103 (July 13, 1981).

We conclude that Ruling 1981–1 was within the statutory authority of the EPAA and was consistent with the intent of Congress in adopting the tertiary incentive provision of the Act. By allowing tertiary expenses paid and reported between January 28 and March 31, 1981, to be recouped by releasing pre-decontrol oil to market prices, the Executive Order as interpreted by Ruling 1981–1 provided additional price incentives for tertiary projects. The Executive Order thus interpreted was consistent with the EPAA purpose of providing "additional price incentives for bona fide enhanced recovery techniques."

D. *Interpretation of Regulations*

1. *Current Production*

■ Union and Tosco contend that even assuming *arguendo* that the Executive Order did not terminate the Tertiary Program, the use of production sold prior to decontrol to recover subsequent expenses would still be unlawful under the provisions of the Tertiary Program itself. They argue that the Program permitted the recovery of expenses only through the sale of "current" crude oil production at market price, and that even if producers could lawfully recoup expenses incurred or paid after January 27, 1981, they could recover such expenses only

through sales of crude oil produced after January 27. Such production, of course, was permitted to be sold at market prices as a result of decontrol.

In effect Union and Tosco question the DOE's interpretation of its *regulations* permitting producers to reach back in time for two months as long as they had met the "conditions precedent" for recoupment of expenses. The DOE contends that 10 C.F.R. § 212.78 operated together with § 212.131(a)(6) to implement the Tertiary Incentive Program, pointing out that Section 212.78(a)(2) and (c) allowed qualified producers to incur and pay expenses and recover a portion of those expenses by charging market-level prices for otherwise price controlled crude oil. Section 212.-131(a)(6) (see note 2, *supra*) allowed a producer two months after the month of sale of price-controlled crude oil to certify or recertify that crude oil to its purchasers. Thus, argues the DOE, if a producer had incurred, paid and reported allowed expenses within that period, all conditions precedent had been met for recoupment, and a producer could include his recoupment in the final price determination.

The district court in Tosco accepted the DOE's interpretation, stating that

[Ruling 1981–1] correctly stated that, absent the Executive Order, a producer who incurred and paid Tertiary recovery expenses prior to February 28, 1981, and March 31, 1981, could have recouped those expenses through the recertification of crude oil it had sold in the months of December 1980 and January 1981, respectively.

Memorandum Decision, p. 10.

The district court in Union concluded that Ruling 1981–1 was inconsistent with the provisions of the tertiary incentive regulations. The court found the DOE's interpretation erroneous because of "its confusion over the operation of the two-month reporting period" and its assumption "that the two-month period allowed extended time for a producer *both* to recertify previous oil sales *and* to incur new expenditures." In

the opinion of the court the regulations (10 C.F.R. §§ 212.78(a), 212.131(a)) "clearly indicate that the two-month period pertains *only* to the recertification process" and "does not govern the timing of the expenditure." Memorandum Decision, pg. 12.[23]

In support of their contention that the Tertiary Incentive Program did not permit recovery of expenses for crude oil sold prior to January 27, 1981, Union and Tosco rely heavily on the use of the term "current production" in the preamble to the rules relating to the Program. When the agency first proposed the Tertiary Incentive Program, the preamble stated that under the program a producer could release

> some current crude oil production ... to return some but not all of the expenditures in the current period. For example, we might allow in 1 month or quarterly period the release of a number of barrels of current crude oil production to a price sufficient to permit the recovery of some percentage (e.g., 50 percent) of the incremental tertiary expenditures made in that period or a prior period.

43 Fed.Reg. 33679, 33685 (Aug. 1, 1978). In the preamble to the final rule, the DOE stated that expenses could be recouped "through charging market prices for current crude oil production." 44 Fed.Reg. 51148, 51149 (Aug. 30, 1979).

The DOE maintains that it first coined the term "current production" in an effort to distinguish tertiary *incentive* production from tertiary *incremental* production under 10 C.F.R. § 212.78(a). In its initial proposal for additional price incentives for tertiary recovery techniques, the agency described the phrase "current production" as production occurring "prior to actual production resulting from the tertiary recovery project" and as "pretertiary production". In this way, argues the DOE, it distinguished "current production" from "incre-

mental production", which referred to the increase in production resulting from such a project, 42 Fed.Reg. 2646, 2655 (Jan. 12, 1977). This was confirmed in a later rulemaking in which the agency described its general proposal for what eventually became the tertiary incentive program as allowing "a limited category of tertiary projects requiring substantial initial investment and involving high risks to receive higher prices for some amounts of pretertiary or 'current' production...." 43 Fed. Reg. 33679, 33685 (August 1, 1978). The DOE argues further that Union's contention that "current production" must be construed in a restrictive manner runs counter to the agency's prior statements which manifest its consistent interpretation of the regulations "so as to encourage the increased utilization of tertiary recovery techniques."

### 2. *Were Answers # 5 and # 7 Inconsistent?*

The district court in Union found Answers # 5 and # 7 in Ruling 1981–1 inconsistent because Answer # 5 required qualification for certification before decontrol, whereas Answer # 7 permits qualification *after* decontrol. The Tosco court, however, concluded that Answer # 5 simply "asserted that crude oil sold during the months of December 1980 and January 1981 which would have qualified for recertification in the absence of the Executive Order, could still be recertified (from price-controlled price to market price) as Tertiary Incentive Program Oil." The court recognized that under Answer # 7 "a firm could qualify under the Tertiary Incentive Program after June 28, 1981, and then recertify oil it had sold during December and January, so long as the Tertiary expenses were incurred, paid and reported prior to February 28, 1981 and March 31, 1981, respectively.

**23.** The court, however, based its conclusion upon the wrong subpart of the regulation, i.e., § 212.78(a)(1), which applies only to crude oil produced from the tertiary project itself. The applicable regulation designated "Tertiary incentive crude oil" § 212.78(a)(2) reads: "Notwithstanding the provisions of § 212.73(a) be-

ginning January 1, 1980, first sales of crude oil by or for the behalf of a producer are not subject to the ceiling price limitations of this Subpart, provided that the tertiary incentive revenue from such sales does not exceed the recoupable allowed expenses attributable to that producer."

While Answer # 5 discusses the certification process generally, Answer # 7 specifically relates to recertification based upon tertiary expenses incurred and paid *after* decontrol. Moreover, Answer # 5 refers not only to tertiary incentive crude oil but to all types of oil subject to possible recertification, e.g., stripper, newly discovered, etc. Except for tertiary incentive crude oil, all other types qualified for upper tier or market prices at the time they were sold because the qualification was based on the special nature of the crude oil or the property where it was produced. On the other hand, the payment of expenses for tertiary projects, which qualified crude oil for recertification as tertiary incentive oil, usually took place after the sale of the oil involved. We find no inconsistency in Answers # 5 and # 7.

### 3. *Deference*

■ As noted above, an agency interpretation should be upheld if it is a reasonable construction. It need not be the *only* reasonable choice. Ruling 1981–1 was issued 15 days after the issuance of Executive Order 12287 to provide immediate guidance in response to questions submitted to the agency concerning the effect of decontrol on various regulatory programs. The ruling interpreted existing regulations in the light of the Executive Order.[24] We conclude that the agency reasonably interpreted § 212.78(a)(2) as permitting tertiary expenses to be recouped through sales of *any* crude oil subject to (re)certification under § 212.131(a)(6).[25] Applying the well established "great deference" standard to the circumstance of this case, we agree with the *Diamond Shamrock* and *Tosco* courts that

24. Moreover, as set forth in Note 19, *supra*, the DOE and Office of the President had cooperated in the drafting of the Executive Order and the DOE gave the Office of Management and Budget advance notice of the proposal to issue Ruling 1981–1.

25. We note that § 212.78(a)(2) does not itself contain the words "current production" or any other language purporting to limit recoupment to sales occurring at a particular time.

26. 5 U.S.C. § 553(d) reads:

Ruling 1981–1 properly interpreted the regulations and Executive Order.

### VI. *The In-House Expense Amendment*

As noted above, the in-house expense amendment to permit recovery of expenses incurred between affiliated entities was made effective upon publication of the final rule. The district court in Tosco held the rule invalid by reason of the DOE's failure to sustain its burden of showing that this was justified under an exception to the 30-day wait period required by 5 U.S.C. § 553(d).[26] The DOE claims that the amendment satisfied two of the exceptions to § 553(d), i.e., it "relieve[d] a restriction" and was "for good cause found and published with the rule."

### A. *Purpose of 5 U.S.C. § 553(d)*

As the court noted in *Nance v. Environmental Protection Agency*, 645 F.2d 701, 708–09 (9 Cir. 1981):

The legislative history of 5 U.S.C. § 553(d) indicates that the primary purpose of the provision was not to encourage prepublication dialogue, but rather to permit petitions for reconsideration and "to 'afford persons affected a reasonable time to prepare for the effective date of a rule or rules or to take other action which the issuance may prompt.'" *United States v. Gavrilovic*, 551 F.2d 1099, 1104 (8 Cir. 1977) (*quoting* S.Rep.No.752, 79th Cong., 1st Sess. 15 (1946)).

The DOE contends, and we agree, that the district court apparently based its decision on factors applicable to 5 U.S.C. § 553(b), which requires notice and opportunity for comment prior to the adoption of the rules, rather than § 553(d), which re-

The required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except—

(1) a substantive rule which grants or recognizes an exemption or relieves a restriction; .

(2) interpretative rules and statements of policy; or

(3) as otherwise provided by the agency for good cause found and published with the rule.

quires publication of rules at least 30 days before the effective date.[27] There is no contention that the DOE did not comply with § 553(b). It published notice of its proposed in-house expense amendment and provided an opportunity for written comments and a public hearing. 45 Fed.Reg. 54688 (August 15, 1980). All interested parties, including Tosco, had an opportunity to participate in the rulemaking process before the amendment was adopted.[28]

### B. Did In-House Amendment Relieve a Restriction?

Prior to January 5, 1981, a producer was restricted in the expenses recoupable under the Tertiary Incentive Program to those "incurred in arms-length transactions and for fair market value." 10 C.F.R. § 212.-78(c) (1980). The DOE in its Notice of Proposed Rulemaking proposed to "modify several of the limitations that apply to the recovery of allowed expenses." 45 Fed.Reg. 54688 (August 15, 1980). The final rule amended the definition of "recoupable allowed expenses" to include expenses which were "incurred in arms-length transactions or do not exceed the price that the producers would have paid in an arms-length transaction." 46 Fed.Reg. 1246, 1248 (January 5, 1980).

Tosco argues that the "relief of restriction" exception should be narrowly construed in order to maximize the two-fold purpose which the 30-day wait period is designed to serve: (1) to ensure that the agency has an opportunity "to correct any error or oversight in regulations before, rather than after, they become effective,"[29] and thus give administrative agencies "another opportunity to correct mistakes or inadvertencies" by reconsidering a rule publication; and (2) to "afford persons affected

a reasonable time to prepare for the effective date of a rule or to take any other action which the issuance of rules may prompt."[30]

Tosco contends that because refiners and purchasers of crude oil were adversely affected by the amendment, they were entitled to 30 days advance notice so they could attempt to persuade the DOE to rescind the rule before it became effective and adjust their behavior so as to minimize the rule's adverse impact upon them (e.g., by purchasing crude oil from purchasers not engaging in tertiary projects or by reducing the total amount of their crude oil purchases).

The DOE contends that "Both in form and substance, this amendment granted an exemption and relieved a restriction." The restriction of "recoupable allowed expenses" to those incurred in arms-length transactions "was lifted and replaced with a less restrictive definition" which would permit a producer to recover also the expense of an in-house goods or service if that cost were no greater than would be paid to an outside source for the same goods or service. 46 Fed.Reg. 1246, 1248. The DOE argues further that "even if producers were able to raise their prices as a result of the Amendment, the Amendment must in any event be upheld because it merely granted a further exemption from price controls."

The DOE also argues that the rulemaking record supports its conclusion that the in-house expenses amendment would actually benefit, not harm, refiners and other purchasers of crude oil. At the hearing on the proposed rulemaking, there was no evidence that producers would utilize the amendment to recoup expenses that would not otherwise have been incurred in arms-length transactions. The DOE therefore

---

**27.** As noted in United States v. Gavrilovic, 551 F.2d 1099, 1104 n.9 (8 Cir. 1977), many "cases seemingly confuse the functions of § 553(b) and (c) ["prepublication dialogue between the public and the agency"] with that of § 553(d) and (e)."

**28.** 27 firms participated in the rulemaking process, and none opposed the proposed amendment. Tosco did not participate.

**29.** Senate Judiciary Committee Print (June 1945) at 10, reprinted in Legislative History of the Administrative Procedure Act at 20, S.Doc. No.248, 79th Cong., 2d Sess. (1946).

**30.** APA Legislative History at 201.

concluded that the amendment would actually *reduce* the amount of tertiary expenses incurred and thus *reduce* the amount of expenses recovered under the Tertiary Incentive Program, because tertiary producers could probably obtain goods and services from their affiliates at lower prices than they could from unaffiliated producers.

We conclude that the in-house amendment should be deemed to "relieve a restriction" within the provisions of § 553(d)(1). We find Tosco's argument that the amendment resulted in a significant burden upon refiners unconvincing for two reasons: first, the rulemaking record indicated that the alleged burden would be nonexistent;[31] and, second, the alleged burden (higher prices for certain quantities of domestic crude oil) is the result of market forces and not the product of obligations imposed by the regulatory scheme. The amendment merely increased the amount of crude oil exempt from mandatory price ceilings.

Having concluded that the in-house amendment "relieved a restriction", it is unnecessary to rule upon the DOE's second contention that the amendment was "for good cause found and published with the rule."

### VII. *Motion for Comprehensive Injunctive Relief*

Tosco seeks injunctive relief pursuant to § 211(e)(2) of the Economic Stabilization Act (ESA), as amended, 12 U.S.C. § 1904 note, and Rule 15(a) of the General Rules of this court, to implement on an industry-wide basis (1) the relief that the district court granted Tosco with respect to certifications based on in-house expenses, and (2) the relief that Tosco sought but was denied with respect to post-decontrol expenses.

In view of our holdings that both Ruling 1981–1 and the in-house amendment are valid, it is unnecessary to consider Tosco's motion; and the motion is denied.

### VIII. *Conclusion*

These cases present a number of close questions. In their resolution we have recognized the "great deference" due an agency's interpretation of an applicable statute, executive order and its own regulations. We have recognized also that an agency ruling must be upheld if it is a "reasonable" choice of possible interpretations. We conclude that (1) Executive Order 12287 did not terminate the Tertiary Incentive Program; (2) the extension of the Program beyond the date of decontrol did not violate the intent of Congress and did not exceed the Agency's statutory authority under the EPAA; (3) Ruling 1981–1 was a reasonable interpretation of the Executive Order and the Agency's own regulations and accordingly is valid; and (4) the in-house amendment relieved a restriction within the meaning of § 553(d)(1) and is valid.

We reverse the district court in *Union Oil Company of California v. DOE, et al.* (Appeal No. 9–60). We affirm the holding in *Tosco Corporation v. DOE, et al.* (Appeal No. 9–61) that Ruling 1981–1 is valid and reverse the court's holding (Appeal No. 9–63) that the in-house amendment is invalid. We deny the motion of Tosco Corporation for injunctive relief (Appeal No. 9–64).

---

**31.** Tosco is precluded from collaterally attacking the record by reason of its failure to participate in the rulemaking. *Environmental De-* *fense Fund v. EPA,* 598 F.2d 62, 91 (D.C.Cir. 1978); *Nader v. NRC,* 513 F.2d 1045, 1054–55 (D.C.Cir.1975).