**TEXACO, INC., Plaintiff,**

v.

**DEPARTMENT OF ENERGY, and Donald P. Hodel, Secretary of Energy, Defendants,**

and

**Marathon Petroleum Company, and Mobil Oil Corporation, and Ashland Oil, Inc., and Texas City Refining, Inc., and Shell Oil Company, Intervenor-Defendants.**

**AMERICAN PETROFINA, INCORPORATED, and Tosco Corporation, Plaintiffs,**

v.

**DEPARTMENT OF ENERGY, and Donald P. Hodel, Secretary of Energy, Defendants,**

and

**Mobil Oil Corporation, and Ashland Oil, Inc., and Shell Oil Company, Intervenor-Defendants.**

**PENNZOIL COMPANY, and Tenneco Oil Company, Plaintiffs,**

v.

**Ronald REAGAN, President of the United States, and Department of Energy, and Donald P. Hodel, Secretary of Energy, Defendants,**

and

**Mobil Oil Corporation, and Ashland Oil, Inc., and Shell Oil Company, Intervenor-Defendants.**

Civ. A. Nos. 84–391–JLL, 84–410–JLL and 84–456–JLL.

United States District Court, D. Delaware.

March 20, 1985.

Richard Pell of Tybout, Redfearn, Casarino & Pell, Wilmington, Del., and Thomas A. Donovan of Kirkpatrick, Lockhart, Johnson & Hutchison, Pittsburgh, Pa., of counsel, for intervenor-defendant Ashland Oil, Inc.

Allen M. Terrell, Jr., of Richards, Layton & Finger, Wilmington, Del., and Robert R. Morrow of Sutherland, Asbill & Brennan, Washington, D.C., of counsel, for intervenor-defendant Texas City Refining, Inc.

E. Norman Veasey and Stephen E. Herrmann of Richards, Layton & Finger, Wilmington, Del., and Alvin B. Gibson, Houston, Tex., of counsel, for intervenor-defendant Shell Oil.

William O. LaMotte III and Richard D. Allen of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., and Stephen Bard, White Plains, N.Y., of counsel, for plaintiff Texaco, Inc.

William O. LaMotte III and Richard D. Allen of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., and Kenneth L. Bachman, Jr., and Eugene M. Goott of Cleary, Gottlieb, Steen & Hamilton, Washington, D.C., of counsel, for plaintiffs American Petrofina, Inc., and Tosco Corp.

Richard I.G. Jones of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, Del.,

and John Mathis of Baker & Botts, Washington, D.C., of counsel, for plaintiffs Pennzoil Co. and Teneco Oil Co.

Joseph J. Farnan, Jr., U.S. Atty., and Sue L. Robinson, Asst. U.S. Atty., Wilmington, Del., and Catherine C. Cook of the Dept. of Energy, of counsel, for the Federal defendants.

Allen M. Terrell, Jr., of Richards, Layton & Finger, Wilmington, Del., and James Wilderotter of Jones, Day, Reavis & Pogue, Washington, D.C., of counsel, for intervenor-defendant Marathon Petroleum Co.

Stephen E. Herrmann of Richards, Layton & Finger, Wilmington, Del., and Dan Joseph and David Holzworth of Akin, Gump, Strauss, Hauer & Feld, Washington, D.C., of counsel, for intervenor-defendant Mobil Oil Corp.

## OPINION

LATCHUM, Senior District Judge.

These consolidated actions were filed by oil companies seeking to compel the United States Department of Energy ("DOE" or "the Department") to publish notices allegedly required to bring about the orderly and lawful conclusion of a regulatory system known as the "entitlements program." Opposing the plaintiffs are, in addition to the federal defendants, a number of intervening oil companies which stand to lose hundreds of millions of dollars in aggregate if the notices are published and enforced. The cases are now before the Court on cross-motions for summary judgment, on intervenor-defendant Ashland Oil, Incorporated's ("Ashland") motion to dismiss, and on the federal defendants' motion to stay a cross-claim asserted by Ashland. Because the Court is convinced that DOE is required by its own mandatory regulations to publish the notices, the plaintiffs' motion[1] for summary judgment will be granted, and the defendants' motions for sum-

mary judgment and Ashland's motion to dismiss will be denied. The federal defendants' motion to stay consideration of Ashland's cross-claim will be granted.

## I. BACKGROUND

### A. *The Entitlements Program*

In the wake of the Arab oil embargo, Congress enacted the Emergency Petroleum Allocation Act of 1973, Pub.L. No. 93–159, 87 Stat. 628 (codified as amended at 15 U.S.C. §§ 751–760h), and thereby authorized the regulatory system at issue in these suits. That system, called the "entitlements program," became a part of the overall regulation of the oil industry but was instituted as a sort of regulation regulator, a cure for ills that oil price controls created in the economy.

Price controls were two-tiered and were based on the separation of oil production into three categories. In general, the volume of crude produced from a given property was measured against a base level of production, equal to an average of production from the property during 1972. That portion of production less than or equal to the base level was designated "old" oil and on first sale was subject to "lower tier" price ceilings; production above the base level was designated "new" oil and in turn subject to "higher tier" ceilings on first sale; imported oil and certain domestic production, such as that from low-yield, so-called "stripper" wells and that obtained by enhanced recovery methods, was known as "exempt" oil and was free of price regulation. *See* 10 C.F.R. § 212(D) (1981); *Union Oil Co. of Cal. v. Department of Energy,* 688 F.2d 797, 800 (Temp.Emer.Ct. App.1982), *cert. denied,* 459 U.S. 1202, 103 S.Ct. 1186, 75 L.Ed.2d 433 (1983); *Exxon Corp. v. Department of Energy,* 601 F.Supp. 1395, 1398–1399 (D.Del.1985). The difference in prices[2] resulting from regula-

---

**1.** All of the plaintiffs joined in a single motion and set of briefs. (*See* Docket Item ["D.I."] 18, D.I. 19, D.I. 43. Unless otherwise noted, references to Docket Items are to Civil Action No. 84–410–JLL.)

**2.** "The price differential was significant. For example, in December, 1980, the average price per barrel of the three categories of crude oil was: lower tier, $7.49; upper tier, $15.51; exempt, $34.55." *Exxon Corp. v. Department of*

tion distorted competition among oil refiners, giving those with greater access to price-controlled crude an obvious advantage. *See* 48 Fed.Reg. 50826 (Nov. 3, 1983). To redress the inequities thus imposed on the market, the Government determined that it should distribute price-controlled crude equally to all refiners and it designed the entitlements program to accomplish that distribution. 39 Fed.Reg. 31650 (Aug. 30, 1974).

Rather than requiring the physical transfer of crude oil among refiners, the entitlements program provided for money transfers based on each refiner's access to price-controlled crude. As this Court has previously explained,

> [t]he entitlements program set forth at 10 C.F.R. §§ 211.66 and 211.67 operated generally in the following manner. An "entitlement" constituted the right to refine one barrel of price-controlled crude oil. Each month, each refiner was allocated a number of entitlements equal to the number of barrels of crude oil it refined for that month, multiplied by the percentage of price-controlled crude oil in the national crude oil supply. In order to have the right to refine all their price-controlled crude oil, refiners with above-average access to price-controlled crude oil were required to purchase entitlements from refiners that, by virtue of having below-average access to such crude oil, had an excess of entitlements. Thus, pursuant to the entitlements program, there was a substantial transfer of

funds each month from those refiners that were required to buy entitlements to those that were authorized to sell entitlements.

*Diamond Shamrock Corp. v. Edwards,* 510 F.Supp. 1376, 1379 (D.Del.1981). Over time, these mandatory monthly transfers would, in effect, equalize access to price-controlled oil, but, from month to month, predictable administrative delays prevented the satisfaction of that goal. *Id.* at 1380 & n. 5. Time had to be allowed for refiners to gather and report information on the kinds and costs of crude oil they refined, and further time was spent while DOE received the information and calculated from it the number of entitlements to issue to each refiner. Consequently, there was in the program from its inception a two-month lag between a refiner's processing of any given batch of oil and DOE's publication of an entitlements notice based on that processing. *Id.*

#### B. *Decontrol*

The two-month lag in the entitlements program became a focus of intense litigation when, shortly after assuming the presidency, Ronald Reagan ordered the immediate decontrol of the oil industry. *See* Exec. Order No. 12287, 46 Fed.Reg. 9909 (Jan. 30, 1981);[3] (*see, e.g., Diamond Shamrock Corp. v. Edwards,* 510 F.Supp. 1376 (D.Del.1981); *Howell Corp. v. Department of Energy,* 4 Energy Mgmt. (CCH) ¶ 26,296 (S.D.Tex. Apr. 22, 1981); *Mobil Oil Corp. v. Department of Energy,* 520 F.Supp. 420

*Energy,* 601 F.Supp. 1395, 1399 n. 1 (D.Del.1985) (citing 46 Fed.Reg. 14157–58 (Feb. 26, 1981)).

**3.** That Order provided in pertinent part:
By the authority vested in me as President by the Constitution and statutes of the United States of America, including the Emergency Petroleum Allocation Act of 1973, as amended [15 U.S.C. § 751 *et seq.*], ... and in order to provide for an immediate and orderly decontrol of crude oil and refined petroleum products, it is hereby ordered as follows:
Section 1. All crude oil and refined petroleum products are exempted from the price and allocation controls adopted pursuant to the Emergency Petroleum Allocation Act of 1973, as amended. The Secretary of Energy shall promptly take such action as is necessary to

revoke the price and allocation regulations made unnecessary by this Order.

\* \* \* \* \* \*

Sec. 3. The Secretary of Energy may, pursuant to Executive Order No. 11790 as amended by Executive Order No. 12038, adopt such regulations and take such actions as he deems necessary to implement this Order, including the promulgation of entitlements notices for periods prior to this Order and the establishment of a mechanism for entitlements adjustments for periods prior to this Order.
Sec. 4. The Secretary of Energy is authorized to take such other actions as he deems necessary to ensure that the purposes of this Order are effectuated.
46 Fed.Reg. 9909–10 (January 30, 1981).

N.D.N.Y.), *rev'd*, 659 F.2d 150 (Temp.Emer. Ct.App.), *cert. denied*, 454 U.S. 1110, 102 S.Ct. 687, 70 L.Ed.2d 651 (1981). Because of the lag, entitlements notices reflecting crude oil refining done in the final weeks of 1980 and the first weeks of 1981 had yet to be published when the President's decontrol order ("Executive Order" or "Order") was signed on January 28, 1981. Within a month of the Presidential pronouncement, DOE published Ruling 1981–1 for the express purpose of "promot[ing] the immediate implementation" of decontrol. 46 Fed. Reg. 12945, 12946 (Feb. 19, 1981). Citing section three of the Executive Order, DOE stated it had "authority to promulgate entitlements notices for periods prior to January 28, 1981, and further to establish a mechanism for entitlements adjustments for periods prior to [that date]." *Id.* The Department went on to announce that it would exercise its authority and publish entitlements notices, first, in February 1981 to account for December 1980 refining activities ("the December notice"), and second, in March 1981 to account for refining done in January 1981 before the date of the Executive Order ("the January notice"). *Id.* It also planned to make final adjustments in the entitlements program to correct regulatory action taken on misinformation or miscalculation about refining activities. *Id.* As the year 1981 progressed, the Department appeared to be as good as its word. On February twentieth it issued the December notice, 46 Fed.Reg. 14157 (Feb. 26, 1981), and on February twenty-seventh it began the required rulemaking for establishing a mechanism to wind up the entitlements program. 46 Fed.Reg. 15112 (Mar. 3, 1981). The winding-up procedure eventually resulted in plans to issue a final, corrective entitlements notice ("the clean-

up notice"). 46 Fed.Reg. 36092 (July 13, 1981).

While DOE was laying the groundwork for its decontrol designs, however, oil companies were rushing *en masse* to the federal courts to enjoin or to cheer on the Department, as their financial interests dictated. *See, e.g., Winston Refining Co. v. Department of Energy*, C.A. No. C–81–78–WS, slip. op. (M.D.N.C. Mar. 11, 1981); *Diamond Shamrock Corp. v. Edwards*, 510 F.Supp. 1376 (D.Del.1981); *Mobil Oil Corp. v. Department of Energy*, 520 F.Supp. 420 (N.D.N.Y.), *rev'd*, 659 F.2d 150 (Temp. Emer.Ct.App.), *cert. denied*, 454 U.S. 1110, 102 S.Ct. 687, 70 L.Ed.2d 651 (1981). Some of the oil companies which would be required to buy entitlements, i.e., give up money to other oil companies if the remaining notices were published, sought asylum in the language of immediacy in the President's decontrol order. They claimed that DOE's authority to administer the entitlements program had been cut off instantaneously and completely. *See Diamond Shamrock*, 510 F.Supp. at 1384; *Howell Corp.*, 4 Energy Mgmt. (CCH) ¶ 26,296 at 28,294; *cf. Mobil*, 520 F.Supp. at 455. Attacking on a different front, one company was able to obtain an injunction with the argument that DOE had been arbitrary and capricious in planning to issue further entitlements when there was evidence suggesting that the refinery information on which the issuance would be based was false or misleading. *See Mobil*, 520 F.Supp. at 443–60. Eventually the Department succeeded in beating back these challenges, but the court battles cost considerable time, time that worked remarkable changes in the thinking at DOE. When, by the end of 1981,[4] the way was finally clear for publication of the remaining notices,

---

4. The last injunction preventing publication of the entitlements notices was lifted in December, 1981, when the Supreme Court refused to review the decision in *Mobil Oil Corp. v. Department of Energy*, 659 F.2d 150 (Temp.Emer.Ct. App.), *cert. denied*, 454 U.S. 1110, 102 S.Ct. 687, 70 L.Ed.2d 651 (1981). Nevertheless, the Department decided to await the resolution of conflicting court decisions governing a regulatory

program related to the entitlements program before it published the notices. *See Union Oil Co. v. Department of Energy*, 688 F.2d 797 (Temp.Emer.Ct.App.1982), *cert. denied*, 459 U.S. 1202, 103 S.Ct. 1186, 75 L.Ed.2d 433 (1983). But while the fate of the related program may have been a practical impediment, it was not a legal one.

DOE was beginning to doubt the wisdom of taking that action.

At least as late as June 6, 1982, the Department was maintaining that it was obligated by law to publish the notices. *See* D.I. 27A at A–164, A–167; *cf. Union Oil Co. v. Department of Energy,* 688 F.2d 797, 808–09 (Temp.Emer.Ct.App.1982), *cert. denied,* 459 U.S. 1202, 103 S.Ct. 1186, 75 L.Ed.2d 433 (1983). But the next month, July of 1982, DOE announced that it would hold a public proceeding to seek "the views and comments of interested persons with respect to any changes in circumstances that may have occurred or other matters that might affect the publication of further entitlements lists. Only after consideration of such views and comments would DOE make a determination regarding publication of further entitlements lists." 47 Fed. Reg. 30279 (July 13, 1982). This was the first indication DOE had given to anyone that publication of the remaining notices was, as far as the Government was concerned, anything but a foregone conclusion. But the July 1982 announcement was more than the start of an astonishing about-face in DOE policy; it was also an uncommonly controversial assertion of authority.

Ordinarily, there is nothing surprising in an agency's convening a public proceeding to take comments on a proposed course of action. But, then, ordinarily there is no question that the agency has the authority to convene such a proceeding. In this case, there is that question. The legislation granting DOE the power to regulate the oil industry, the Emergency Petroleum Allocation Act ("EPAA"), was amended in 1975 to provide for its own expiration on September 30, 1981. Energy Policy and Conservation Act, Pub.L. No. 94–163, § 461, 89 Stat.

955 (codified at 15 U.S.C. § 760g). Consequently, when the public proceeding promised by the July 1982 announcement actually came to pass in December of 1983,[5] many oil companies, including the plaintiffs in the present litigation, complained that DOE was acting extralegally, that its power under the EPAA had long since lapsed. (*See, e.g.,* C.A. No. 84–391–JLL, D.I. 23A at 266–67; C.A. No. 84–391–JLL, D.I. 23B at 449–50, 474; C.A. No. 84–391–JLL, D.I. 23E at 1355, 1659.) Their complaints were all the more bitter because between the July 1982 announcement and the December 1983 public proceeding, DOE's doubts about publishing the entitlements notices had turned to tentative decision. It did not plan to publish them. 48 Fed.Reg. 50824 (Nov. 3, 1983).

On June 28, 1984, DOE made its decision final, 49 Fed.Reg. 2740 (July 3, 1984), and shortly thereafter these suits were filed.[6]

## II. THE MOTIONS FOR SUMMARY JUDGMENT

### A. *Judicial Review*

■ DOE contends that its decision to end the entitlements program without publishing the remaining notices is not a matter properly subject to judicial review because Congress left that decision to the sole discretion of the executive branch. (D.I. 36 at 26–32.) This is an argument that should be disposed of at the outset, although doing so involves statutory interpretation directly affecting the final resolution of the merits.[7]

In claiming unreviewable discretion, DOE points to the following language from section 18 of the EPAA: "at midnight on

---

**5.** *See* 48 Fed.Reg. 50824 (Nov. 3, 1983); C.A. No. 84–391–JLL, D.I. 23A–D.I. 23G. Part of the year and a half delay between the announcement and the proceeding was brought about by DOE's desire to see the resolution of all then-pending litigation which it believed might affect the entitlements program. (*See* D.I. 36 at 23–24.) But that cannot explain the entire delay. The litigation DOE was waiting on concluded in February of 1983. *Union Oil Co. v. Department of Energy,* 688 F.2d 797 (Temp.Emer.Ct.App.1982), *cert. denied,* 459 U.S. 1202, 103 S.Ct. 1186, 75 L.Ed.2d

433 (1983). DOE has not accounted for its failure to take action during the greater part of 1983.

**6.** The consolidated cases were filed on the following dates: C.A. No. 84–391–JLL on July 17, 1984; C.A. No. 84–410–JLL on July 31, 1984; and C.A. No. 84–456–JLL on August 20, 1984.

**7.** *See, infra,* II B.

the conclusion of the 40th month [i.e. May 31, 1979] ... the President's authority to promulgate, make effective, and amend [the petroleum price and allocation regulations] shall become discretionary...." 15 U.S.C. § 760g; (see D.I. 36 at 26). According to DOE, that passage is "a carefully-crafted compromise settling the battle between the legislative and executive branches" over the duration of controls on the oil industry, (id. at 28–29) and, as such, it falls within a category of "political, military, economic, or managerial choices that are not really susceptible to judicial review." *Local 2855, AFGE v. United States,* 602 F.2d 574, 579 (3d Cir.1979).

■ But DOE has made and lost essentially the same argument before. In *Metzenbaum v. Edwards,* 510 F.Supp. 609 (D.D.C.1981), the Department found itself defending the President's abrupt pronouncement of immediate decontrol—abrupt, at least, by Government standards. Several United States Senators filed a complaint alleging that the Executive Order was invalid because it had not been preceded by the formalities which generally accompany a federal agency's regulatory action. *Id.* at 610. The court held that the President in issuing an Executive Order is not subject to the same constraints that bind Government agencies in their promulgation of regulations. *Id.* at 611. But before reaching that conclusion, the court rejected DOE's claim, "that the decision to decontrol was entirely within the unfettered discretion of the President and that his decision to proceed without advance notice or public hearing [was] for that reason not judicially reviewable. That claim [was] based on 15 U.S.C. § 760g[,]" *Metzenbaum,* 510 F.Supp. at 610, the same statute DOE cites in this case, and the claim was rejected because of the following very significant distinction, which this Court also recognizes as determinative:

Although the statute leaves the *substantive* decision as to whether or not to promulgate petroleum control regula-

tions to the President's discretion, it does not in any way relieve him of the obligation to comply with required *procedures* as he exercises that discretion. None of the decisions cited by the government holds or intimates that, merely because a government official has discretion with respect to substance, he is relieved of the obligation to comply with the procedures mandated by law. It is clear that the ... compliance or noncompliance with such procedural laws is subject to judicial review.

*Id.* at 611 (emphasis in original) (footnote omitted); *see also Natural Resources Defense Council, Inc. v. S.E.C.,* 606 F.2d 1031, 1044–45 (D.C.Cir.1979); *cf. Chrysler Corp. v. Brown,* 441 U.S. 281, 303, 99 S.Ct. 1705, 1718, 60 L.Ed.2d 208 (1979). Nothing has dimmed the clarity of that principle in the four years since it was thus expressed; federal agencies, including DOE, are still required to follow certain procedural rules in making their substantive decision,[8] and federal courts are still empowered to see that they do.

**B.** *The Executive Order*

■ At the heart of these cases are conflicting interpretations of the Presidential directive on decontrol.[9] However, resolving the cases does not require a determination of the full and exact meaning of the directive; it is sufficient to point out something it does not mean and something it cannot mean.

DOE argues that the Executive Order made the entitlements regulations ineffective and that refusing to publish the remaining notices is simply akin to "the housekeeping detail of revoking ineffective regulations...." (D.I. 48 at 14.) Although the argument is crucial to DOE's case, it is more notable for what it fails to say than for what it says; it deserves comment primarily because of its unstated premise that the Executive Order is retroactively effective. The argument could only be true if that premise were true and it is

**8.** *See infra,* n. 10.

**9.** *See supra,* n. 3.

not. The entitlements notices now at issue are based on actions and transactions that occurred prior to the President's pronouncement of decontrol. It follows, then, that regardless of the Executive Order's effect on the regulations from the date of the Order and into the future, the Order could not affect the operations of the oil industry prior to the date of its release, unless, perhaps, it were meant to have retroactive effect. But as DOE itself so successfully and so long contended, the Executive Order was never meant to be retroactive.

In presenting its case to the Temporary Emergency Court of Appeals ("TECA") in *Union Oil Co. v. Department of Energy,* 688 F.2d 797 (Temp.Emer.Ct.App.1982), *cert. denied,* 459 U.S. 1202, 103 S.Ct. 1186, 75 L.Ed.2d 433 (1983), the Department made the following unqualified assertions:

> [T]he regulations governing the Entitlements Program remained in effect and were in operation after January 28, 1981 with respect to crude oil received and refined before that date.
>
> \* \* \* \* \* \*
>
> Because the Order was effective "immediately," not retroactively, it did not affect the regulations governing prices charged in crude oil sales that occurred prior to decontrol.... The Executive Order was "self-executing" in that it decontrolled crude oil sold on or after January 28, 1981. It did not, however, change the regulatory structure with respect to crude oil sold before that date.

(D.I. 27A at 173–75; emphasis and footnotes omitted.) The persuasiveness and accuracy of those statements is a matter of record; TECA explicitly adopted the interpretation of the Executive Order espoused in them, saying:

> We conclude that the DOE's interpretation of the Executive Order is a reasonable one: that the Order ... affected only crude oil sold *after* January 27, 1981. Crude oil sold after that date was expressly *"exempted"* from the "price and allocation controls." The order expressly delegated to the Secretary the

responsibility of taking action to *revoke* unnecessary regulations and to adopt regulations and take action "necessary to implement this Order." We agree with the DOE that sales before January 28, 1981 were still subject to the regulations, "even if aspects of the transaction took place at a later time."

*Union Oil Co.,* 688 F.2d at 808–09 (emphasis in original, footnotes omitted).

Before TECA decided the *Union* case, DOE had already argued that same interpretation of the Executive Order to this Court (*see* D.I. 27A at 179, 182–83), and this Court had decided that:

> Examination of the relevant regulations, the Federal Register Notices proposing and adopting those regulations, and past agency statements and practice ... lead to the conclusion that DOE's interpretation appears to be correct. [T]he entitlements program has always run on a lagged basis, because of delays in data accumulation[, and] ... according to DOE's long-standing interpretation of the entitlements program, this lag would necessitate the promulgation of entitlements notices two months after the program ended. Such a long-standing interpretation developed outside of the context of litigation should be afforded deference. Given this interpretation of the system and its regulations, which has been adopted by the Court, the Order's reference to entitlements notices "for periods prior to this Order" must include entitlements based upon oil sales in December and January.

*Diamond Shamrock Corp. v. Edwards,* 510 F.Supp. 1376, 1389 (D.Del.1981).

This Court's own previous decision and the holding of TECA in the *Union* case make it completely clear that the Executive Order was not meant to have and does not have any retroactive effect.

Beyond this judgment of what the Executive Order does not mean, there is a point to be made about what it cannot mean. The Department argues that no procedural prerequisites faced it as it considered how

to conclude the entitlements program be-. cause the program was committed to the sole discretion of the President who in turn granted his unrestrained authority to the Secretary of Energy. (D.I. 36 at 30; D.I. 48 at 8–10.) But, as has already been explained in connection with the reviewability of the DOE decision at issue in these cases, *see supra,* II A, the President's decontrol order could not have authorized DOE to engage in rulemaking without following the procedures imposed by Congress on agencies making quasi-legislative decisions.[10] The Department itself has once again been its own most effective opponent on this point. At oral argument in *Metzenbaum v. Edwards,* 510 F.Supp. 609 (D.D.C.1981), the following colloquy took place:

> THE COURT: If this [*i.e.,* decontrol] had been done by the Secretary of Energy he would have been subject to the rule-making provisions of the APA [the Administrative Procedure Act] and he would also have been subject to whatever section of the DOE organization Act [DOEOA] is involved, is that right?
>
> MR. SCOTT [counsel for DOE]: That is correct, Your Honor.

\* \* \* \* \* \*

If ... the President said I will delegate to non-elected appointed officials, and maybe not even appointed officials, DOE bureaucrats, if you will, I want to make sure that there are more stringent procedures when those people are deciding what is in the public interest than when the President is deciding what is in the public interest. I think the APA clearly reflects that, an intention by Congress.

(D.I. 43A at A–423.) There is indeed that intention reflected in the APA, *see* 5 U.S.C. §§ 551 *et seq.,* and in the DOEOA as well, *see* 42 U.S.C. § 7191(a)(1), and there is nothing in the EPAA that contradicts or countermands it.[11] Hence whatever else the Executive Order might mean, and that is a question the Court need not address, it cannot mean that DOE was free of congressionally ordained procedural constraints.[12] *See Chrysler Corp. v. Brown,* 441 U.S. 281, 302–03, 99 S.Ct. 1705, 1717–18, 60 L.Ed.2d 208 (1979).

C. *The Entitlements Regulations And The Expiration Of The EPAA*

 The entitlements regulations are indisputably legislative in nature, *see supra,* n. 10, and as such have the "force and effect of law." *Chrysler Corp. v. Brown,* 441 U.S. 281, 304, 99 S.Ct. 1705, 1718–19,

---

**10.** DOE does not argue, nor could it argue with any persuasiveness, that it was not bound by ordinary procedural requirements because the decision to issue or not to issue the entitlements was an interpretive or policy ruling rather than a substantive, legislative-type ruling. *Cf. Chrysler Corp. v. Brown,* 441 U.S. 281, 301–303, 99 S.Ct. 1705, 1717–1718, 60 L.Ed.2d 208 (1979); *Pharmaceutical Manufacturers Association v. Finch,* 307 F.Supp. 858, 862–63 (D.Del.1970). It is undeniable that any decision about issuing entitlements constitutes one "affecting individual rights and obligations," *Morton v. Ruiz,* 415 U.S. 199, 232, 94 S.Ct. 1055, 1073, 39 L.Ed.2d 270 (1974), and is therefore a substantive regulation, the promulgation of which must conform with the procedural requirements imposed by Congress. *Id.; accord Chrysler Corp. v. Brown,* 441 U.S. at 303, 99 S.Ct. at 1718.

**11.** The Department's references to past presidential actions affecting oil industry regulation (*see* D.I. 48 at 8–9 & n. 4) are without significance because, as the Department itself points out (D.I. 48 at 9 n. 4), those actions were not

challenged; therefore their procedural validity was never tested. Furthermore, as noted above, the Department has previously indicated that the procedural constraints the President operates under are not necessarily the same as those that bind the Department itself. *See supra,* text following n. 10; *cf. Metzenbaum v. Edwards,* 510 F.Supp. 609, 611 (D.D.C.1981).

**12.** Among the constraints the Order could not affect is the constraint imposed by the expiration clause in 15 U.S.C. § 760g.· DOE claims to have "continuing regulatory authority to issue or not issue lists—and to conduct any proceedings necessary to make the decision." (D.I. 48 at 7.) But it bases its claim on an interpretation of the EPAA. Neither DOE nor any of the intervenor-defendants attempts to argue that the Executive Order somehow of itself provides DOE with authority to act beyond the expiration date set by Congress. To the extent their silence indicates *their belief that the Executive Order could not extend DOE's authority to begin the promulgation of new rules after the expiration date,* the Court agrees with them.

60 L.Ed.2d 208 (1979). As long as such regulations are in effect, the promulgating agency has no choice but to follow them. *See, e.g., United States v. Nixon,* 418 U.S. 683, 694–96, 94 S.Ct. 3090, 3100–02, 41 L.Ed.2d 1039 (1974); *United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260, 266–67, 74 S.Ct. 499, 502–03, 98 L.Ed. 681 (1954); *Husky Oil Co. v. Department of Energy,* 582 F.2d 644, 651 (Temp.Emer.Ct. App.1978). Regarding the entitlements program specifically, TECA has emphasized "it [is] of paramount importance that the [Department] adhere to its own announced rules...." *Delta Refining Co. v. Federal Energy Admin.,* 559 F.2d 1190, 1199 (Temp.Emer.Ct.App.1977).

■ The rules announced in the entitlements program feature the following significant statements on DOE's duties:

> For each month, ... each refiner *shall be issued* a number of entitlements by [DOE] equal to the number of barrels of crude oil included in the total volume of that refiner's crude oil runs to stills for that month multiplied by the national domestic crude oil supply ratio.... [13]
>
> \* \* \* \* \* \*
>
> The DOE *shall issue* entitlements for each month ... pursuant to a notice issued on the fifteenth day of the second month following that month.

10 C.F.R. § 211.67(a)(1), (i)(1) (1984) (emphasis and footnotes added). The language of the regulations thus places an unqualified obligation on the Department to publish monthly entitlements lists. DOE concedes both that the regulations as written mandate the issuance of entitlements and that those mandatory regulations have never been revoked. (*See* D.I. 48 at 12.) It is also a matter of record that DOE's first steps toward altering the application of the regulations were not taken until long after the expiration of the EPAA. *See* 47 Fed.

Reg. 30279 (July 13, 1972). Given those facts and given that the Executive Order itself does not affect tne regulations as they apply to pre-January 28, 1981 oil transactions nor does it give DOE power to alter its regulations without appropriate rulemaking, *see supra,* II B, the key question in these cases becomes this: What effect did the expiration of the EPAA have on DOE's authority to amend or enforce the regulations constituting the entitlements program?

Section 18 of the EPAA contains an expiration clause and a savings clause which read:

> The authority to promulgate and amend any regulation or to issue any order under this chapter shall expire at midnight September 30, 1981, but such expiration shall not affect any action or pending proceedings, administrative, civil, or criminal, not finally determined on such date, nor any administrative, civil, or criminal action or proceeding, whether or not pending, based upon any act committed or liability incurred prior to such expiration date.

15 U.S.C. § 760g. According to DOE, the savings clause preserved the Department's authority to issue entitlements after the expiration date because the termination of the entitlements program was "an action or pending proceeding ... not finally determined on September 30, 1981." (D.I. 64 at 46; *see* D.I. 48 at 7–8.) But, continues DOE, surviving inextricably with the power to issue entitlements is the power the Department has chosen to exercise, the power to decline to issue them. (D.I. 48 at 16.)

The intervenor-defendants disagree with DOE on this point. While they are eager to concur that DOE's decision to not publish the remaining notices is sound, they contend it is so because DOE has no authority to publish the notices anyway. In their view, DOE's power to administer the

---

**13.** "Runs to stills" is defined as "the total number of barrels of crude oil input to distillation units processed by a refiner ...." 10 C.F.R. § 211.62 (1981). The "national domestic crude oil supply ratio" is "the ratio of the volume of old oil included in all refiners' crude oil re-

ceipts, less adjustments divided by the total volume of crude oil refined during the period in question." *Texaco, Inc. v. Department of Energy,* 663 F.2d 158, 162 n. 12 (D.C.Cir.1980); *cf.* 10 C.F.R. § 211.62 (1981).

entitlements program ended entirely on Sept. 30, 1981. (*See, e.g.,* D.I. 22 at 21–30; D.I. 24 at 46–48; D.I. 31 at 33.)

Naturally, the plaintiffs dispute both DOE's and the intervenors' statutory interpretations. The plaintiffs argue that DOE goes too far and the intervenor-defendants not far enough in applying the savings clause. For the following reasons, the Court agrees with that assessment.

The intervenor-defendants' argument is clearly without merit. The savings clause must mean something; it is not simply surplusage. One category of matters that it purports to save is actions or proceedings that were pending but not resolved before the expiration date. It is apparently necessary to belabor the obvious and point out that the implementation of DOE's initial decision to publish the remaining entitlements notices was a matter pending and not resolved before September 30, 1981. *See supra,* n. 4 and accompanying text. At the very least, then, DOE has the power to publish those notices.

Whether that power carries with it the power to refuse to publish the notices does not have so obvious an answer. DOE argues the plausible notion that the two powers must be linked because otherwise the Department will be required to revive long dormant regulations regardless of the wisdom of such a revival and Congress could not have intended that. (D.I. 48 at 16.) As a policy argument that may have merit, but as statutory interpretation it is badly flawed. To begin with, even assuming the existence of a monolithic congressional intent, the elusive nature of intent makes it a peculiarly poor candidate for discovery by negative implication. DOE may well be correct in its assertion that Congress did not intend the satisfaction of entitlements obligations to be delayed some three and a half years past the expiration of the EPAA, but to say Congress did not intend that result is quite different than saying Congress foresaw it and intended that it not occur. The former interpretation recognizes the delay as an unexpected consequence of unforeseen causes, the latter

would turn it into an expected and forbidden outcome. This Court is unwilling to read such prescience into the statute.

To the extent any inferences can be drawn about congressional intent, a better approach to drawing them than hindsight hypothecating is to look to legislative history. In discussing the meaning of a proposed savings clause to be placed in the EPAA at the time Congress was considering an extension of the Act beyond its scheduled 1975 expiration, these statements were made:

SENATOR BUMPERS. I have a question I would like to direct to the chairman of the committee in light of the recent events which have occurred.

It is my understanding that if we now extend the Emergency Petroleum Allocation Act, and this extension expires and is not renewed, the [DOE's] ... authority ... to enforce liabilities that were incurred, when the act and regulations were in effect will not expire.

\* \* \* \* \* \*

[Some members of the oil industry] have apparently questioned [DOE's] authority after the act expires to issue entitlements and to order transfers of entitlements under its crude cost equalization program for crude oil that was purchased and refined while the program was in effect.

\* \* \* \* \* \*

[T]he valid laws and regulations that were passed must be enforced, and no one should be able to avoid obligations and liabilities incurred while the act was in effect through a narrow and technical reading of the savings clause.

[D]o you agree I am correct in my understanding of the act and that the [DOE] can perform these critical tasks if and when controls expire?

SENATOR JACKSON. The Senator is fully correct. That is my understanding of what ... the act currently provides. In short, [the pertinent section] means that after controls expire the President has the clear authority to enforce all

prior valid liabilities and take whatever remedial action is necessary to provide full relief to those who obtained rights under ... the act when it was in effect. 121 Cong.Rec. S28706 (Sept. 11, 1975). Though these statements are not entirely on point because they speak only of the authority to issue entitlements and not of an option to refrain from issuing them, the tone of the remarks makes most reasonable by far the inference that the Senators took it for granted DOE would act to satisfy the rights of which they were speaking.[14] And indeed it seems that if "no one should be able to avoid obligations and liabilities ... through a narrow and technical reading of the savings clause[,]" *id.*, then neither should anyone be allowed to avoid them through DOE's giving a broad and imprecise reading that assumes a grant of discretionary power though nothing was said of it.

But the most compelling reason for rejecting DOE's interpretation of the savings clause is the plain language of the expiration clause. It says, "The authority to promulgate and amend any regulation ... shall expire at midnight September 30, 1981...." 15 U.S.C. § 760g. Faced with that phrasing, DOE admitted that the expiration clause "appears to state that DOE's statutory authority to amend the entitlements regulations [has] lapsed...." 48 Fed.Reg. 50832 (Nov. 3, 1983). Yet the Department is trying to do precisely what it acknowledged is now unlawful; it is trying to amend its regulations so that they no longer mandate publication of the remaining notices. *Cf. Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.,* 463

U.S. 29, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). The public proceeding DOE conducted was the quintessence of a rulemaking. By the Department's own account it involved, "an exhaustive analysis of the effects of the notices," 48 Fed.Reg. 50829 (Nov. 3, 1983), a "determination involv[ing] the drawing of a line," 49 Fed. Reg. 27410 (July 3, 1984), in short, a balancing of interests to achieve a policy goal. *See* 48 Fed.Reg. 50829 (Nov. 3, 1983). DOE's announcement of its decision not to issue further entitlements contains this telling comment: "[T]he nature of rulemaking itself is to deal with classes generally, even if there may be anomalies within the class and that is the case here as well." 49 Fed.Reg. 27417 (July 3, 1984). Because it clearly did partake of the very "nature of rulemaking," the proceeding DOE conducted was in contravention of the expiration clause of the EPAA and is accordingly without effect.

DOE protests, however, that no matter what the Court may hold about the effect of the expiration of the EPAA, the entitlements regulations cannot maintain their mandatory character because enforcing them at this late date would be "inconsistent with the purposes of the decontrol order and the EPAA ... [and] would be unlawful." (D.I. 48 at 14.) But the argument is offered without authority or analysis and is a transparent effort to bootstrap the Department out of the legal corner into which it has maneuvered itself by vacillation and delay. It is hardly persuasive for DOE to claim it can accomplish by foot-dragging what has been forbidden by Congress;[15] DOE's power to amend the en-

---

14. The savings clause in the bill discussed by Senators Bumpers and Jackson was substantially the same as that in the original EPAA, *see* S622, 94th Cong., 1st Sess. § 126 (1975), but it was broadened by the conference committee specifically to include the saving of administrative actions whether or not pending before decontrol and liabilities incurred before decontrol. *See* 15 U.S.C. § 760g. The conference committee amendment thus appears to have been designed to allay the concern expressed by Senator Bumpers.

15. This is not the first court to notice and be disturbed by DOE's predilection for procrastination. In *Mobil Oil Corp. v. Department of Energy,* 659 F.2d 150 (Temp.Emer.Ct.App.), *cert. denied,* 454 U.S. 1110, 102 S.Ct. 687, 70 L.Ed.2d 651 (1981), TECA remarked that it was "aware of prior situations in which the agency seems to have been slow in discharging its functions." *Id.* at 153. And in a recently delivered opinion, the United States District Court for the District of Columbia noted with obvious dismay that DOE was responsible for repeated delays in resolution of the case before it. *USA Petroleum*

titlements regulations ended on September 30, 1981 and cannot now be recouped in effect simply by refusing to comply with those regulations.

### D. *The Existence Of Factual Issues*

It is axiomatic that summary judgment can only be granted when there are in a case no issues as to any material fact and the moving party demonstrates it is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 156, 90 S.Ct. 1598, 1607, 26 L.Ed.2d 142 (1970). The intervenor-defendants devoted some paper in their briefs (*see, e.g.,* D.I. 44 at 41, 47; D.I. 45 at 49–54; D.I. 47 at 85–112) and a great deal of time at oral argument (*see* D.I. 64 at 88–107) contending that these cases contain material factual issues and therefore cannot be resolved for plaintiff by summary judgment. The most specific and extensive argumentation is put forth by Ashland. Its brief (D.I. 47 at 85–112) and the presentation of its counsel at oral argument (D.I. 64 at 88–107) are representative of all the intervenors' arguments on this point,[16] and all are rejected.

First, Ashland asserts that "there [are] material unresolved issues of fact as to whether issuance of the Notices would frustrate the purposes of the EPAA and the Entitlements Program." (D.I. 47 at 85.) But the very statement of that argument reveals its error. Whether an action does or does not comport with statutory design is purely a question of legal interpretation and no amount of verbiage can disguise or change that. The question thus poses no barrier to summary judgment. *See Abbott Laboratories v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967).

Second, Ashland claims that "there are material issues of fact affecting Plaintiffs' right to equitable relief." (D.I. 47 at 98.)

Ashland emphasizes perceived flaws in the data DOE would rely on to formulate the entitlements notices (*see* D.I. 64 at 91–93, 96–98), and the plaintiffs' alleged role in avoiding entitlements obligations in the past. (*Id.* at 95; D.I. 47 at 98–100.) But, as the Court noted at oral argument (D.I. 64 at 93), those factual issues, important though they may be, are irrelevant to the question of DOE's duty to publish entitlements notices. Sifting through the statutes, the regulations, and the President's decontrol order to discover that duty is, again, purely a matter of legal analysis and poses no bar to summary judgment. *See Abbott Laboratories v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967); *Standard Oil Co. v. Department of Energy*, 596 F.2d 1029, 1066 (Temp.Emer.Ct.App.1978).

### III. ASHLAND'S MOTION TO DISMISS AND THE FEDERAL DEFENDANTS' MOTION ON ASHLAND'S CROSS–CLAIM

■ Two final motions require resolution. First, Ashland has filed a motion to dismiss the complaint of plaintiffs American Petrofina, Incorporated ("Fina") and Tosco Corporation ("Tosco") (D.I. 32) "for failure to exhaust administrative remedies and as not being ripe for judicial review." (D.I. 33 at 2.) Because of clear and controlling precedent in this Court, the motion will be denied.

The bases Ashland claims for its motion are Tosco's having filed an administrative action at DOE (*id.* at 16–22) and Tosco's and Fina's having addressed in their complaint an aspect of decontrol not raised by the other plaintiffs. (*Id.* at 22–26.) At about the time Tosco and Fina filed their suit in this Court, Tosco also filed an Application for Exception with DOE's Office of Hearings and Appeals.[17] According to

---

*Co. v. Department of Energy*, C.A. No. 84–1016, slip op. at 5 n. 3 (Feb. 15, 1985).

**16.** At oral argument, Ashland's attorney apparently spoke for all the intervenor-defendants on this subject. (D.I. 64 at 54–55.)

**17.** DOE has authority to grant what is called "exception relief" to those who would otherwise suffer a peculiar hardship or inequity because of the regulations imposed on the oil industry by the EPAA and DOE. *See* 42 U.S.C. § 7194(a); *Exxon Corp. v. Department of Energy*, 601

Ashland, Tosco is seeking from DOE "the identical relief that is asked for [in this Court,]" (*id.* at 16) which "demonstrates ... that Tosco and Fina have failed to exhaust available avenues for ... administrative relief." (*Id.*) Apparently, one of the reasons Tosco is claiming to be entitled to exceptional treatment is that it has allegedly been required to bear a disproportionate share of the regulatory burden on the oil industry because of DOE's decision not to publish the remaining entitlements notices and the interaction of that decision with the enforcement of another set of regulations known as the "tertiary incentive program." [18] (*See id.* at 22–26.) Although the other plaintiffs allude to the tertiary incentive program in their complaints (*see* C.A. No. 84–391, D.I. 1 at ¶ 23; C.A. No. 84–456, D.I. 1 at 26), only Tosco and Fina have discussed that program and the effect on some members of the oil industry of its combination with the entitlements program. (*See* D.I. 1 at ¶¶ 4–6.) Ashland asserts that this added feature in the Tosco and Fina complaint introduces "[a] factual issue that is properly left to the agency in the first instance[,]" (D.I. 42 at 4) and that those plaintiffs' claim for relief is therefore not ripe for judicial review. (D.I. 33 at 22–26.)

The problem with Ashland's arguments is they treat the situation Tosco and Fina are in as if it were unique; Ashland ignores the law this Court has already clarified in similar cases. In *Phillips Petroleum Co. v. Federal Energy Admin.,* 435 F.Supp. 1239 (D.Del.1977), several oil companies sued a predecessor agency of DOE's, challenging its interpretation of its regulations and an executive order. *Id.* at

1245. The agency raised the doctrines of ripeness and exhaustion of administrative remedies and moved to dismiss. *Id.* In ruling on the motion, the Court set forth the following principles of law. On the doctrine of ripeness the Court said:

> [A] controversy is ripe for pre-enforcement judicial relief if an affirmative answer can be given to ... [these] four questions: (1) are the issues presented purely legal, (2) are the issues based on final agency action, (3) does the controversy have a direct and immediate impact on the plaintiffs' businesses, and (4) is the litigation calculated to expedite final resolution rather than delay or impede effective agency enforcement?

*Id.* In the Tosco-Fina case challenged by Ashland, the answers to all four questions are emphatically affirmative. Yes, the issues are purely legal. That has already been explained, *see supra,* II D, and Ashland has failed to show how the references to the tertiary incentive program in the Tosco-Fina complaint make resolution of that case any different than the others at bar. Yes, the agency action at the heart of the Tosco-Fina case is final; it is expressly so, 49 Fed.Reg. 27410 (July 3, 1984), and that fact is not changed by the chance that exception relief might be granted to Tosco or anyone else.[19] As stated in the *Phillips* case:

> The mere possibility that [DOE] could decide, in the exception proceedings, on the basis of "gross inequity" or "serious hardship," to relieve one or more of the companies of the regulatory requirement which the [DOE] has determined to be final, binding and enforceable, does not

---

F.Supp. 1395, 1400–1401 (D.Del.1985). Tosco's application with DOE seeks such relief.

**18.** The tertiary incentive program need not be looked into in these cases and hence no explanation of it is required. A brief explanation of the program can be found in this Court's recent opinion in *Exxon Corp. v. Department of Energy,* 601 F.Supp. 1395, 1399–1400 (1985).

**19.** On January 14, 1985, DOE published its "final" decision on the treatment of entitlements exception orders. 50 Fed.Reg. 1920; D.I. 59.

The finality of the decision is questionable because the granting of relief is conditioned on the Office of Hearing and Appeals' determining that "refiners as a class were injured by violations or alleged violations of the EPAA regulations...." 50 Fed.Reg. 1921. Referring to this condition, the United States District Court for the District of Columbia stated, "Once again DOE has delayed telling ... whether or not ... [an] exemption order will be implemented." *U.S.A. Petroleum Co. v. Department of Energy,* C.A. No. 84–1017, slip op. at 5 n. 3 (Feb. 15, 1985).

deprive this Court of the authority to review the agency's unequivocal interpretation of the applicable regulations. *Phillips Petroleum Co.*, 435 F.Supp. at 1246. Affirmative answers to the third and fourth questions are plainly in order because, as the vigorous defense mounted by the intervenors in the present cases attests, enormous sums of money are at stake and this litigation will help finally determine in whose corporate coffers that money should go.

The *Phillips* case also contains this dispositive statement on the exhaustion of administrative remedies:

> The Court concludes that defendants' contention, that until the exception proceedings are concluded that plaintiffs have failed to exhaust their administrative remedies, is without merit.... One thing the exhaustion doctrine makes clear is that it is not intended to require endless pursuit of agency procedures with respect to issues on which the agency has taken a final position.
>
> \* \* \* \* \* \*
>
> The [DOE] has already had numerous opportunities to correct the alleged error of its ways on these issues and no more is required under the exhaustion doctrine.

*Id.* at 1248 (citations omitted).

Legal principles explained in *Phillips* were reiterated in a second opinion in that case, 449 F.Supp. 760 (D.Del.1978), which was affirmed by TECA, *Standard Oil Co. v. Department of Energy*, 596 F.2d 1029 (1978), and the principles were repeated again in *Pennzoil Co. v. Department of Energy*, 466 F.Supp. 238 (D.Del.1979). These precedents require the denial of Ashland's motion to dismiss the Tosco-Fina complaint. They also prompt the Court to question Ashland's good faith in filing that

motion, but the Court cannot say with assurance that Ashland acted "in bad faith, vexatiously, wantonly, or for oppressive reasons," and Tosco's and Fina's request for costs incurred in responding to the motion will thus also be denied. *Hall v. Cole*, 412 U.S. 1, 5, 93 S.Ct. 1943, 1946, 36 L.Ed.2d 702 (1973); *accord Straub v. Vaisman & Co., Inc.*, 540 F.2d 591, 598 (3d Cir.1976).

█ The last item to consider is the unopposed motion of the federal defendants to stay consideration of the cross-claim asserted by Ashland against DOE and the Secretary of Energy. Ashland has filed a cross-claim challenging the data it says DOE will use in issuing future entitlements (*see* D.I. 37 at 21–63); however, because the cross-claim was expressly made contingent on this Court's determination that DOE has a duty to publish the remaining notices (*id.* at 21), and the outcome of that contingency has been heretofore unknown, DOE has moved the Court to stay consideration of the cross-claim and to extend additional time to answer.[20] The Court agrees with the Department that compelling the immediate litigation of the conditional cross-claim would be an unwarranted expenditure of judicial resources and the litigants' time. *Exxon Corp. v. Department of Energy*, 577 F.Supp. 703, 707 (D.Del.1983). The motion will therefore be granted.[21]

## IV. CONCLUSION

The Court has determined that the entitlements regulations have never been validly revoked, amended, or otherwise altered, that they impose an unequivocal obligation on DOE to issue entitlements for crude oil transactions which took place prior to the January 28, 1981 decontrol order,

---

**20.** On March 5, 1985, the federal defendants filed an amended answer to Ashland's cross-claim (D.I. 63), but the Court does not take that as an indication that the federal defendants have withdrawn their motion.

**21.** By staying consideration of Ashland's cross-claim rather than simply dismissing it, the

Court does not indicate that the cross-claim is properly a part of this suit. The Court suspects that if the issues raised by the cross-claim were fully briefed, the doctrine of exhaustion of administrative remedies would prevent the Court from considering the matter at all. *See supra,* II D.

and that DOE's power to enforce those regulations by publishing the remaining notices has been preserved by the savings clause in 15 U.S.C. § 760g. The effect of these conclusions may be, as the defendants claim, to extend regulations which will mechanically and counterproductively affect the oil industry despite the Government's efforts to deregulate. But the Court is charged to apply laws, not to judge their merit. In the events leading up to these cases DOE has played the role of the sorcerer's apprentice and now that it has allowed its regulatory creature to get out of control it must turn to Congress, not the courts, for power to solve the problems created. Because of its own regulations, its own past successes in litigation over the entitlements program, and its own delays, DOE has made it necessary for this Court to require publication of the remaining notices.

A judgment will be entered in accordance with this opinion.