CANADIANOXY OFFSHORE PRODUCTION CO. (FORMERLY: CITIES SERVICE COMPANY AND CITIES OFFSHORE PRODUCTION CO.), PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 12102-89.     Filed April 29, 1993.

*Emily A. Parker* and *Mary J. Clariday,* for petitioner.
*Roger Rhodes* and *Kenneth L. Bressler,* for respondent.

OPINION

PARR, *Judge:* Respondent determined the following deficiencies in petitioner's windfall profit tax:

| Year ended | Deficiency |
| --- | --- |
| Dec. 31, 1982 | $1,140,864 |

| Quarter ended | Deficiency |
| --- | --- |
| Mar. 31, 1982 | $4,889,780 |
| June 30, 1982 | 182,349 |
| Sept. 30, 1982 | 1,198,963 |
| Dec. 31, 1982 | 525,510 |

After concessions, the issue remaining for decision is whether crude oil sold by petitioner after January 28, 1981, when President Reagan's Executive Order No. 12,287, 3 C.F.R. 124 (1982), fully decontrolled crude oil and refined petroleum products, produced tertiary incentive revenue as the term is defined in section 4994(c)(2)(C)[1] and Department of Energy regulations, 10 C.F.R. sec. 212.78(c) (1981); and, if not, whether petitioner's credits for windfall profit tax under section 4994(c)(2), deemed paid on September 30, 1981, are thereby eliminated.

For convenience, findings of fact and opinion are combined herein. The case was submitted fully stipulated under Rule 122. The stipulated facts, together with the attached exhibits, are incorporated herein by this reference.

Petitioner is a Delaware corporation with its principal place of business in Dallas, Texas. During the taxable quarters in issue, petitioner was known as Cities Service Co. Petitioner changed its name from Cities Service Co. to Cities Offshore Production Co. as of September 8, 1983, and then to CanadianOxy Offshore Production Co. as of March 1, 1984.

Petitioner timely filed its returns, Forms 720, for the quarters ended March 31, 1982, June 30, 1982, September 30,

---

[1] All section references are to the Internal Revenue Code of 1954 in effect for the periods in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

1982, and December 31, 1982; and an annual Federal excise tax return for the period ended December 31, 1982.

Petitioner was engaged in the exploration, development, production, transportation, refining, and marketing of petroleum and natural gas and products thereof. Petitioner was the producer of crude oil removed from 22 oil and gas leases in which petitioner owned a working interest.

## DOE Regulations

Prior to August 30, 1979, the price of domestic crude oil sold in the United States was controlled by regulations promulgated by the Department of Energy (DOE) pursuant to the Emergency Petroleum Allocation Act of 1973 (EPAA), Pub. L. 93-159, 87 Stat. 627. Depending on its vintage and type, oil was divided into differing classes or tiers and assigned a corresponding ceiling price. H. Rept. 96-304, at 4-5 (1979). President Carter announced his plan for phased decontrol of domestic crude oil prices between June 1, 1979, and September 30, 1981, when existing price control authority was scheduled to end. Id. at 5. Accordingly, DOE promulgated regulations pursuant to the EPAA gradually decontrolling the price of domestic crude oil produced. DOE also established the "Tertiary Incentive Program", which created an exemption from the price controls for a new category of exempt oil: tertiary incentive crude oil.

The program was designed to provide "front-end" (i.e., preproduction) money for the initiation or the expansion of expensive enhanced recovery projects. See 44 Fed. Reg. 51148 (Aug. 30, 1979).[2] Front-end oil is defined in section 4994(c)(4)(B) as "any domestic crude oil which is not subject to a first sale ceiling price under the energy regulations solely by reason of the front-end tertiary provisions of such regulations." The decontrol of tertiary incentive oil was intended to give producers an incentive to use expensive and risky tertiary recovery methods to maximize recovery from petroleum reserves by allowing producers to recoup tertiary recovery expenditures through sales of tertiary production at uncontrolled market prices. See 44 Fed. Reg. 51148 (Aug. 30,

---

[2] Tertiary enhanced recovery techniques maximize oil production from depleting fields and typically include the injection of carbon dioxide, steam, or other substances in order to increase pressures in the oil reservoir and thereby promote additional production. *Union Oil Co. of California v. DOE,* 688 F.2d 797, 800 n.3 (Temp. Emer. Ct. App. 1982).

1979); see also *Elf Aquitaine, Inc. v. Placid Oil Co.*, 624 F. Supp. 994 (D. Del. 1985).

To get the benefit of market price the producer was required to certify to the purchasers that the oil qualified as tertiary incentive oil.

## Windfall Profit Tax

In response to the decontrolling of crude oil prices, Congress enacted the Crude Oil Windfall Profit Tax Act of 1980 (WPTA) effective March 1, 1980. Pub. L. 96-223, 94 Stat. 229; see *United States v. Ptasynski*, 462 U.S. 74 (1983). Congress believed that the substantial price increases on previously discovered oil that had resulted from phased decontrol provided an appropriate object of taxation. S. Rept. 96-394, at 6 (1979), 1980-3 C.B. 131, 142. Congress designed the tax to raise $227.3 billion in tax revenues over the period the tax was in effect. The windfall profit tax (WPT) was a temporary tax that was to be phased out over a 33-month period beginning no earlier than January 1988, and ending no later than January 1991, regardless of the amount of money collected. See "Crude Oil Windfall Profit Tax Act of 1980", 67 Stand. Fed. Tax Rept. No. 16, at 11 (Apr. 3, 1980). WPT was repealed on August 23, 1988. See Omnibus Trade and Competitiveness Act of 1988, Pub. L. 100-418, sec. 1941(a), 102 Stat. 1107, 1322.

WPT was designed to capture a significant portion of the expected "windfall profits" via an excise tax on crude oil produced in the United States, subject to certain limitations and exemptions.[3] Congress did not want WPT to discourage production of domestic oil; thus the WPTA contained relief provisions for certain types of production, including tertiary recovery methods. See S. Rept. 96-394, at 6 (1979), 1980-3 C.B. 131, 142. Under the Tertiary Incentive Program (not to be confused with tertiary incentive revenue, see *infra* p. 386) promulgated by DOE, producers of front-end oil were allowed to recoup tertiary recovery expenditures through sales of tertiary production at uncontrolled (decontrolled) market prices. Congress' purpose was to minimize U.S. dependence on for-

---

[3] Although called a tax on profits, the tax was a temporary excise or severance tax on production, imposed at the wellhead as each barrel of oil was removed from the ground and sold. "Crude Oil Windfall Profit Tax Act of 1980", 67 Stand. Fed. Tax Rept. No. 16, at 11 (Apr. 3, 1980).

eign oil by creating a financial incentive to further recovery from petroleum reserves.

Under the energy regulations, both independents and integrated producers could sell front-end oil at market price. In general, integrated producers are distinguished from independent producers by their involvement in refining and retailing activities. See sec. 4992(b) and cross-references to sec. 613A(c)(2) and (d)(4). Independent producers were exempt from WPT on front-end oil removed before October 1, 1981. Sec. 4994(c)(1). Petitioner qualified as an "integrated producer" within the meaning of section 4994(c)(2). For integrated producers using tertiary recovery methods, front-end tertiary oil was subject to WPT, but the amount of any "allowed expenses" not recouped through the sale of such oil at market price pursuant to the Tertiary Incentive Program was to be treated as a payment of WPT by the producer on September 30, 1981.[4] Allowed expenses were defined as 75 percent of certain expenses incurred and paid from August 22, 1979, in connection with a "qualified tertiary enhanced recovery project" (QTERP).[5] (A QTERP under the energy regulations is synonymous with a "front-end tertiary project" under the WPTA. Sec. 4994(c)(4)(D).) Each of petitioner's leases qualified as a QTERP under 10 C.F.R. section 212.78 of the DOE regulations and as a front-end tertiary project under section 4994(c)(4)(D).[6]

*Tertiary Incentive Revenue*

Tertiary incentive revenue (TIR) arises from sales of crude oil made pursuant to the energy regulations in order to recoup allowed expenses. Tertiary incentive revenue is defined as:

---

[4]Sec. 4994(c)(2) provides:

(2) REFUNDS FOR TERTIARY PROJECTS OF INTEGRATED PRODUCERS.—

(A) IN GENERAL.—In the case of any front-end tertiary project which does not meet the requirements of paragraph (1)(B), the excess of—

(i) the allowed expenses of the producer with respect to such project, over

(ii) the tertiary incentive revenue,

shall be treated as a payment by the producer with respect to the tax imposed by this chapter made on September 30, 1981.

[5]QTERP is defined as "a project for the recovery of crude oil, to the extent that such project involves the application of an enhanced oil recovery technique". 10 C.F.R. sec. 212.78 (1980) (revoked).

[6]The front-end tertiary provisions are those provisions of 10 C.F.R. sec. 212.78 (1981) "which exempt crude oil from ceiling price limitations to provide financing for tertiary projects".

in the case of first sales of crude oil pursuant to the provisions of subsection (a)(2), the excess of the market-clearing price over the otherwise applicable ceiling price less any ad valorem, severance or windfall profit tax attributable to this excess. [10 C.F.R. sec. 212.78(c) (1981) (revoked); see sec. 4994(c)(2)(C).]

In determining WPT, allowed expenses do "not include any amount attributable to periods after September 30, 1981." Sec. 4994(c)(3)(B).

Petitioner certified domestic crude oil produced from August 22, 1979, through January 28, 1981, as tertiary incentive crude oil, pursuant to the tertiary incentive provisions of the DOE regulations and sold such oil at an uncontrolled price.

The parties agree that petitioner:

(1) incurred allowed expenses in connection with front-end tertiary projects from August 22, 1979, through September 30, 1981, in the amount of $11,213,211;

(2) had tertiary incentive revenue from crude oil sold prior to January 29, 1981, in the amount of $4,058,558; and

(3) paid windfall profit tax in the amount of $6,525,799.98 on front-end oil removed prior to January 29, 1981.

*The Presidential Order*

On January 28, 1981, President Reagan issued Executive Order No. 12,287, 46 Fed. Reg. 9909 (Jan. 30, 1981) (herein the order) decontrolling crude oil and refined petroleum products. The President stated that in order to avoid the "actions that could lead to economic distortions and dislocations, and would therefore be contrary to the public interest, this Order shall be effective immediately." *Id.* The order accelerated the phase-out provisions set forth by Congress which would have decontrolled crude oil and petroleum products as of September 30, 1981.

Following issuance of the order, petitioner sold domestic crude oil from January 29, 1981, through September 30, 1981, at an uncontrolled price. None of petitioner's oil produced after the issuance of the order was (re)certified as tertiary incentive crude oil pursuant to the tertiary incentive provisions. Based upon allowed expenses in connection with front-end oil, petitioner claimed credits against its windfall profit tax in the amount of $4,755,106.47 for the quarter ended March 31, 1982, and $28,528.98 for the quarter ended

June 30, 1982. Petitioner also amended its petition to claim an overpayment of WPT in the amount of $242,164.53 for the quarter ended June 30, 1982.

In her notice of deficiency, respondent recalculated petitioner's credits and disallowed a portion for the periods in issue.[7]

Before the order, the producer was required to certify that the oil qualified as tertiary incentive oil within 2 months after its production and sale in order to obtain the benefit of market prices. After the order, certification was not required. However, producers were allowed until March 31, 1981, to recoup certain expenses incurred in connection with the development of tertiary projects, by retroactively recertifying other types of oil as front-end oil. The producers were thus able to obtain market prices for that oil which was sold during the 2 months preceding the order at lower controlled prices.[8]

Petitioner contends that there was no TIR on crude oil sold after President Reagan decontrolled oil prices on January 28, 1981, since there was no controlled price to subtract from market price. Petitioner further argues that the order did not end its entitlement to the front-end oil refund credit deemed paid on September 30, 1981.

The question of how the order affected an *integrated* producer's right to or calculation of the WPT *credit* has not previously been directly addressed by any court. However, the question of what effect the order had on the continuing vitality of the *independent* producer's *exemption* from WPT until September 30, 1981, was addressed in *Gary v. United States,* 708 F. Supp. 1188 (D. Colo. 1989).

In *Gary,* the court stated that front-end oil was not directly affected by the order, which immediately decontrolled all domestic crude oil, since front-end oil was already decontrolled. In that case, WPT was withheld by purchasers of the taxpayer's oil removed from the ground after January 27,

---

[7] The parties have submitted a stipulation of agreed issues. See appendix.

[8] See *Union Oil Co. of California v. DOE,* 688 F.2d 797 (Temp. Emer. Ct. App. 1982). Respondent contends that petitioner had TIR to the extent the amount received for the crude oil exceeded the amount that petitioner *would have received* had the price controls still been in effect. Alternatively, respondent contends that if petitioner did not have TIR, then Congress must have intended for the credit to cease contemporaneously with the end of price controls. However, respondent cites no Code section, regulation, or legislative history indicating congressional intent for either position.

1981, but prior to October 1, 1981. Thereafter, the taxpayers filed a claim for refund on the ground that the oil was front-end oil from an independent producer and, therefore, exempt from WPT.

The Commissioner denied the request for refund, stating that "after January 28, 1981 all domestic crude oil was decontrolled, therefore, no longer was any oil 'not subject to a first sole [sic "sale"] ceiling price under the Energy regulations *solely* by reason of the front-end tertiary provisions of such regulations.'" The Government asserted that since the order decontrolled crude oil as of January 28, 1981, DOE was no longer the *sole* reason for crude oil's exemption.

The court disagreed.

> Plaintiffs [taxpayers] are correct in arguing that if the phrase "under the energy regulations" is afforded its proper weight, then "even after the presidential decontrol, the sole reason that the Production was not subject to a first sale ceiling price *'under the energy regulations'* * * * was because of the front-end tertiary provisions of the Energy Regulations."

*Gary v. United States, supra* at 1191-1192, citing plaintiff's brief with approval.

The court further reasoned that Congress did not intend for the exemption for "front-end oil" to end before October 1, 1981, since the Senate report stated that the special treatment of oil from tertiary recovery projects applied only to *specific barrels* of oil deregulated, not to any subsequent production from the property. The Senate report indicated that this rule would not apply after the termination of price controls on September 30, 1981. *Id.* at 1192; see also S. Rept. 96-394, *supra* at 32, 35, 1980-3 C.B. at 150, 153.

The court acknowledged that the Government might argue that the termination of price controls supports the Government's interpretation of section 4994(c)(4)(B) since it indicates Congress' intent to end the exemption[9] for tertiary oil as soon as the termination of price controls. The court saw a fallacy in this argument. When Congress provided the *tax exemption* for front-end oil, such oil was *already* decontrolled. Nonetheless, Congress determined that front-end oil should not be subject to WPT before October 1, 1981, because, despite the decontrol of its price, it was still too unprofitable for producers to recover. *Gary v. United States, supra* at 1192.

---

[9]See *supra* p. 384.

The court found no reason to believe that "the incentive for producing 'front-end oil' that Congress sought to create by exempting it from windfall profit tax was not still needed following decontrol of all domestic crude oil." *Id.*

In another context, the Temporary Emergency Court of Appeals, in *Union Oil Co. of California v. DOE*, 688 F.2d 797, 808 (1982), agreed that "the retroactive termination of the tertiary incentive [program's] regulations would have the adverse effect of reducing incentives to domestic production and interrupting extensive tertiary planning in direct contravention of the policies underlying the Executive Order." The court concluded that "Executive Order 12287 did not terminate the Tertiary Incentive program". *Id.* at 814.

Thus, it is established in both cases, and we firmly agree, that the order did not terminate the tertiary incentive program since the program's oil prices were already decontrolled. The question remains whether, after the order, oil sold under the tertiary incentive program produced "tertiary incentive revenue" as defined for integrated producers.

In the case at bar, respondent contends that petitioner had TIR to "the extent that the amount received for the crude oil exceeds the amount petitioner would have received had the price controls still been in effect (less any ad valorem, severance taxes or windfall profit taxes attributable to such excess)."

Respondent further contends that the front-end oil credit under section 4994(c)(2)(A) should continue to be calculated in the same manner as it was before the order was issued. Prior to the order, the credit was calculated by subtracting TIR (i.e., market prices less regulated/ceiling prices less any WPT, ad valorem, and severance taxes) from allowed expenses. Respondent contends a fictitious ceiling price (i.e., the amount petitioner would have received *had the price controls still been in effect*) must be used to calculate the front-end oil credit after the order. Otherwise, respondent contends, petitioner would receive a double benefit, a "windfall credit". We disagree.

The amount of credit a taxpayer could receive before and after decontrol is limited by section 4994(c)(2)(B) to the aggregate windfall profit tax imposed. If, for example, prior to decontrol, a taxpayer's credit (i.e., allowed expenses less TIR) was greater than or equal to the amount of taxes paid,

the credit was limited by section 4994(c)(2)(B) to the amount of WPT imposed. If the credit was less than WPT imposed, he received the lesser amount. After decontrol (no differential between ceiling and market prices), we conclude that the credit is based on allowed expenses, limited to the amount of WPT imposed. Thus, a taxpayer can never receive a double benefit, "windfall credit", since the credit is always limited to the amount of WPT imposed.

Respondent further maintains that "Congress did not intend for unforeseen circumstances to affect the application of the energy regulations as to the windfall profit tax," and therefore the ceiling price remained in effect for purposes of calculating the credit. Again, we disagree.

Decontrol was not an unforeseen circumstance. Congress knew beforehand that there was at least a possibility that a President would deregulate the oil industry. Hence, in section 4996(b)(8)(D), Congress stated that "Energy regulations shall be treated as continuing in effect without regard to decontrol of oil prices or any other termination of the application of such regulations." Clearly however, the regulations setting ceiling prices were necessarily terminated when the ceiling prices were terminated.

Although directed toward independent producers, we hold that the rationale set out in *Gary v. United States,* 708 F. Supp. at 1192, applies to integrated producers as well. Congress' purpose in providing the exemption and credit for front-end oil was to encourage and reward producers of tertiary oil upfront, since production was costly and the process unprofitable. Congress considered the recovery of front-end oil to be necessary in order to decrease the United States' dependence on foreign oil. As stated in *Gary,* the incentive for producing front-end oil was still needed following decontrol of all domestic crude oil, since front-end oil was unaffected because it was already decontrolled. For this reason, it was determined that the order did not terminate the exemption for independent producers. We believe the legislative history shows that Congress' intent was to reward all producers of front-end oil. Accordingly, we hold that the order did not directly affect front-end oil as to integrated producers, and that the front-end oil credit was similarly not terminated by the order.

If, as respondent argues, Congress had wanted to continue to calculate the credit by using a "ceiling price" after decontrol, Congress would have stated what the ceiling price would be for the duration of the credit. Congress did not so state, and therefore we will not make such an assumption. Therefore (absent certification or recertification) after decontrol there is no such thing as TIR, since there is no ceiling price and thus no differential between market and ceiling price. In calculating the credit after the order, we conclude that the amount of front-end oil credit should be the allowed expenses, limited by the amount of windfall profit tax paid on the sale of front-end oil.

Congress intended to give producers relief from WPT under the tertiary incentive program until September 30, 1981. We hold that the front-end oil credit for integrated producers was effective through that date, as was the exemption available to independent producers.

To reflect the foregoing,

*Decision will be entered under Rule 155.*

---

## APPENDIX

After the issuance of the notice of deficiency, the parties jointly submitted a stipulation of agreed issues adjusting petitioner's WPT liability as outlined in Form 720 (Windfall Profit Tax Return) for the quarters in issue as follows:

| | *Adjustment in quarter ended 1982* | | | |
|---|---|---|---|---|
| *Deficiency notice item* | *Mar. 31* | *June 30* | *Sept. 30* | *Dec. 31* |
| Net income limitation | $1,524 | - - - | - - - | - - - |
| Condensate production | 6,125 | - - - | - - - | - - - |
| Claims allowed | (13,127) | $(12,200) | - - - | - - - |
| WPT withholding | 100,155 | 113,082 | $86,753 | $114,216 |
| Property #1536294 | 39,996 | 52,938 | 45,279 | 62,107 |
| WPT erroneously omitted | - - - | - - - | - - - | 157 |
| Self-computed interest | - - - | - - - | 1,066,930 | 349,031 |

|  | Adjustments for year ended Dec. 31, 1982 |
|---|---|
| East Binger property | $4,240 |
| East Vacuum property | -0- |
| WPT withholding | 20,747 |
| Buggs #2 | 346 |
| Net income limitation | 72 |
| Hough Morrow A U | 2,648 |

In addition, the parties agreed that petitioner is entitled to a refund of WPT, without regard to the refund issue outlined above, for the quarters ended as follows:

| Quarter ended | Refund amount |
|---|---|
| Mar. 31, 1982 | $1,028,247 |
| June 30, 1982 | 574,961 |
| Sept. 30, 1982 | 618,326 |
| Dec. 31, 1982 | 631,271 |

| Year ended | |
|---|---|
| Dec. 31, 1982 | 1,102,851 |

Moreover, the parties agree that petitioner is entitled to a refund of windfall profit tax, based on the deduction of $62,296,721 of geological and geophysical costs as overhead to be apportioned among petitioner's producing properties for the purpose of recalculating its net income limitation[10] under section 4988(b)(1) in the amounts set forth below:

| Quarter ended | Refund amount |
|---|---|
| Mar. 31, 1982 | $1,166,419.84 |
| June 30, 1982 | 627,190.74 |
| Sept. 30, 1982 | 656,706.63 |
| Dec. 31, 1982 | 665,093.27 |

| Year ended | |
|---|---|
| Dec. 31, 1982 | 2,094,260.14 |

---

[10] Under the net income limitation, the amount of windfall profit on any barrel of oil is limited to 90 percent of the net income attributable to that barrel of oil. See "Crude Oil Windfall Profit Tax Act of 1980", 67 Stand. Fed. Tax Rept. 16, at 16 (Apr. 3, 1980).

Finally, the parties agree "that if [the Court finds] petitioner made an overpayment of WPT in any period in 1982, petitioner will be entitled to interest on the overpayment in accordance with section 6611."